[Cite as *Clements v. Lima Mem. Hosp.*, 2010-Ohio-602.]

## IN THE COURT OF APPEALS OF OHIO
### THIRD APPELLATE DISTRICT
### ALLEN COUNTY

MATTHEW JAMES CLEMENTS, ET AL.,

    PLAINTIFFS-APPELLANTS,
    CROSS-APPELLEES,                CASE NO. 1-09-24

    v.

LIMA MEMORIAL HOSPITAL, ET AL.,

                                  O P I N I O N
    DEFENDANTS-APPELLEES,
    CROSS-APPELLANTS.

Appeal from Allen County Common Pleas Court
Trial Court No. CV 2006-0188

**Judgment Affirmed**

Date of Decision:    February 22, 2010

APPEARANCES:

    *Paul W. Flowers* for Appellants/Cross-Appellees

    *Christina J. Marshall* for Appellees/Cross-Appellants

    *Jeffrey M. Goldberg* for Appellants/Cross-Appellees

**PRESTON, P.J.**

{¶1} Plaintiffs-appellants/cross-appellees, Matthew Clements and Angela Clements, individually and as parents and natural guardians for their son, Owen Clements (hereinafter collectively "Clements"), appeal the judgment of the Allen County Court of Common Pleas entering a judgment in favor of defendants-appellees/cross-appellants, Lima Memorial Hospital (hereinafter "LMH"), Dottie Baker, R.N. (hereinafter "Nurse Baker"), Deborah Bollenbacher, R.N. (hereinafter "Nurse Bollenbacher"), and Nancy Kathleen Hunnaman, R.N. (hereinafter "Nurse Hunnaman") (hereinafter collectively "defendants"), following a jury verdict in favor of defendants-appellees/cross-appellants. For the reasons that follow, we affirm.

{¶2} The facts relevant to this appeal are as follows: Owen Clements was born on January 19, 2004 at approximately 1:43 a.m. at LMH to first-time parents, Angela and Matthew Clements. Owen was a term baby, weighed 3129 grams, and no complications were noted with respect to the delivery.

{¶3} Around 2:45 p.m. on January 19th, Nurse Hunnaman began her 3:00 p.m. to 3:00 a.m. shift in the obstetrics department at LMH. She examined Owen around 3:30 p.m. and evaluated his fontanels (soft spot), skin color (noted "pink"), heart, lung sounds, temperature, abdomen, and bowel sounds, all of which were noted to be normal. She documented that Owen had breast fed "fair" at 6:00 p.m.,

breast fed "well" at 10:00 p.m., and had voided with meconium stools at those times as well. Around 6:30 p.m. she witnessed Dr. John S. Liggett's newborn physical of Owen. During Dr. Liggett's examination of Owen, he noted Owen had normal proportions, color, head, chest and neck, abdomen, musculoskeletal and neurological systems, and skin; however, next to the word "jaundice,"[1] Dr. Liggett placed a question mark. As a result of the questioned jaundice, Dr. Liggett ordered a bilirubin level, Rh typing, and a Coombs test. As discussed below, the Rh typing and the Coombs test results were all negative, although the bilirubin test, which was conducted around 4:00 a.m. on January 20, 2004, showed a level of 7.7.

{¶4} In addition, during the examination, Owen was noted to feel cool to touch and a subsequent temperature reading revealed his temperature at 97.6° F. As a result, Nurse Hunnaman wrapped Owen in blankets, placed him under a warmer, and instructed his parents to keep Owen wrapped in the blankets with his hat on. By midnight, Owen's temperature had increased to 98° F. Also, around midnight, Nurse Hunnaman weighed Owen and noted that his weight was 2960 grams, 5.2% less than his original birth weight.

{¶5} On January 20th around 8:00 a.m., Dr. Vincente W. Romero examined Owen, and after reviewing Owen's medical chart and performing a

---

[1] Jaundice refers to a yellowish coloring of the skin, and will be discussed in further detail below.

physical examination, he assessed Owen to be a healthy newborn. Dr. Romero did notice a mild recession of Owen's lower chin and described his ears as flat pavilion, so he ordered chromosomal studies and set up an appointment for the parents to follow-up with a geneticist.

{¶6} Next, Owen underwent a circumcision around 2:20 p.m. Nurse Baker assisted Dr. Medina with Owen's circumcision. She transported Owen to and from the procedure and gave Owen a bottle to feed. Owen was then documented to have breastfed "fair" at 3:00 p.m.

{¶7} Nurse Bollenbacher reported to duty on January 20th for her 3:00 p.m. to 3:00 a.m. shift, at approximately 2:45 p.m. Around that time, Angela was discharged from LMH. Around 4:00 p.m., Nurse Bollenbacher noted that Owen had breastfed. Although there was no written order in Owen's medical records nor were there any indications that an oral discharge had been authorized over the phone by a physician, Nurse Bollenbacher discharged Owen from LMH around 7:00 p.m. on January 20, 2004.

{¶8} The next day on January 21, 2004, Angela called LMH and indicated that she was having trouble feeding Owen and that his lips and hands were cold and changing color. She was advised by LMH to take Owen immediately to an emergency room. Angela and Matthew took Owen to Joint Township Hospital. When they arrived at the hospital, Owen was non-responsive and began having

seizures. Lab results indicated that Owen's bilirubin level was at 15.6, and that his glucose level had dropped down between one and zero. Attempts were made by the doctors at the hospital to increase Owen's glucose level. They eventually stabilized Owen, and he was then transported to Dayton Children's Hospital.

{¶9} After approximately seven to eight days at Dayton Children's Hospital, Owen's glucose level was eventually stabilized with medication. It was determined that Owen had suffered a severe episode of hypoglycemia, and as a result, had sustained profound, irreversible brain damage.

{¶10} On February 13, 2006, the Clements filed a complaint for medical malpractice against Drs. Liggett and Romero, Nurses Hunnaman, Baker, and Bollenbacher, and LMH by and through its three nurses. (Doc. No. 1). In their complaint, the Clements alleged that Owen should not have been discharged from the hospital after his birth, and that as a result of the early discharge, Owen suffered from severe hypoglycemia and sustained profound brain damage. Answers were filed denying liability. (Doc. No. 1). Over the next three years, the parties conducted extensive discovery. After a denial of the Clements' partial motion for summary judgment, and the dismissal of Dr. Liggett from the action, the case proceeded to jury trial on February 2, 2009 against LMH, Dr. Romero, and the three nurses. Over the next several days, the parties presented their respective cases. One of the expert witnesses the Clements presented was Dr.

Tracey Trotter who testified that, after reviewing the medical records and relevant deposition, he believed that had Owen been kept at LMH longer, his injury could have been avoided. Overall, Dr. Trotter testified that there were indications in the medical records that Owen should have not have been discharged from LMH. In addition to Dr. Trotter's testimony, the Clements called Nurse Camille DiCostanzo to testify about the nursing standard of care. She testified that after looking at the medical records and depositions, there were several concerns she had regarding Owen's health, and that it had been a deviation from the nursing standard of care to have discharged Owen early from LMH.

{¶11} Defendants only called Dr. James Greenberg to testify for their case. Dr. Greenberg stated that Owen's hypoglycemia was not related to the levels of bilirubin nor was it related to any alleged lack of nutrition from the breast feedings. He testified that the typical symptoms of hypoglycemia include lethargy, poor feedings, jittery movements, low tone, limpness, and seizures, none of which Owen had exhibited while he had been at LMH. Finally, Dr. Greenberg said that even if Owen had not been discharged from LMH and had been treated for hypoglycemia, he did not believe that it would have prevented Owen's injury given the difficulty the other hospitals had in maintaining Owen's glucose level.

{¶12} After the defendants rested, Dr. Romero was dismissed from the case pursuant to a settlement agreement with the Clements. The case against

Case No. 1-09-24

LMH and the nurses was then submitted to the jury on February 17, 2009, after which time, the jury returned general verdicts for the defendants. Overall, the jury found in favor of Nurse Hunnaman, Nurse Baker, and Nurse Bollenbacher, and accordingly found in favor of LMH by and through its nurses. In the interrogatories, the jury specified the following:

**With respect to Nurse Hunnaman, the jury found that her conduct had not fallen below the accepted standards of care.**

**With respect to Nurse Baker, the jury found that there was a preponderance of the evidence that Nurse Baker's conduct had fallen below the accepted standards of care, specifically when she "failed to make timely entries in the narrative nursing notes on the newborn flow sheet in regard to Owen's care on 1/20/04 between the hours of 14:00 to 15:30." Nevertheless, the jury found that her failure to make timely entries was not the proximate cause of Owen's injuries.**

**With respect to Nurse Bollenbacher, the jury found that there was a preponderance of the evidence that her conduct had fallen below the accepted standards of care, specifically when she "didn't ensure adequate documentation for Owen's release/discharge from Lima Memorial Hospital, [and] didn't adequately complete page 2 of 4 on the newborn flow sheet documenting examination @ 16 hr on 1/20/04." Nevertheless, the jury found that her failure to adequately complete documentation was not the proximate cause of Owen's injury.**

**Finally, with respect to Dr. Romero, even though he had been dismissed from the case, the jury found that his conduct had not fallen below the accepted standards of care.**

{¶13} The Clements now appeal and raise four assignments of error. In addition, the defendants raise one cross-assignment of error for our review. For

ease of our discussion, we elect to address the Clements' assignments of error out of the order that they were presented.

**PLAINTIFFS' ASSIGNMENT OF ERROR NO. IV**

**GIVEN THE NURSES' ADMISSIONS THAT THE STANDARD OF CARE HAD BEEN VIOLATED IN MULTIPLE INSTANCES, AND THE COMPLETE ABSENCE OF ANY EXPERT TESTIMONY SUGGESTING THAT THEY HAD ACTED APPROPRIATELY, THE JURY'S VERDICT WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶14} In their fourth assignment of error, the Clements argue that the jury's verdict was against the manifest weight of the evidence given the nurses' admissions of negligence and the absence of any defense nursing expert. In response, the defendants claim that despite any admissions made by the nurses, the Clements failed to establish a causal link between the care and treatment rendered at LMH and Owen's hypoglycemia.

{¶15} In determining whether a judgment is against the manifest weight of the evidence, the trier of fact is in a better position to observe the demeanor of the witnesses, examine the evidence, and weigh the credibility of the testimony and evidence. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. Thus, we cannot substitute our judgment for that of the trier of fact when there exists competent, credible evidence going to all the essential elements

Case No. 1-09-24

of a case. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280, 376 N.E.2d 578.

{¶16} In order to establish a medical malpractice claim, the plaintiffs must prove by a preponderance of the evidence that the injury was proximately caused by medical care or treatment that fell below the recognized standards of medical care in the community. *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 131-32, 346 N.E.2d 673. "The failure to prove that the recognized standards of the medical community were not met or to prove that the failure to meet those minimum standards proximately caused the injury is fatal to a claim of medical malpractice." *Kester v. Brakel*, 10th Dist. No. 06AP-253, 2007-Ohio-495, ¶26. The general rule is that because the standards of the medical community are not common knowledge, the plaintiffs must prove causation through expert testimony. *Roberts v. Ohio Permanente Medical Group, Inc.* (1996), 76 Ohio St.3d 483, 668 N.E.2d 480. The same is true with respect to nurses and negligence actions, "expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and that the nurse's negligence, if any, was the proximate cause of the patient's injury." *Ramage v. Central Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 592 N.E.2d 828, paragraph one of the syllabus.

{¶17} With respect to LMH's liability in this case, under the doctrine of respondeat superior, a hospital is liable for the negligent acts of its employees.

Case No. 1-09-24

*Klema v. St. Elizabeth's Hosp. of Youngstown* (1960), 170 Ohio St. 519, 527, 166 N.E.2d 765. Thus, if LMH's nurses were negligent in this particular case, under the doctrine of respondeat superior, LMH would also be negligent. See. id.

{¶18} After reviewing all of the evidence in the record, with respect to the issues highlighted by the parties concerning the liability of LMH and its nurses, the jurors heard and weighed the testimony from Nurse Hunnaman, Nurse Baker, and Nurse Bollenbacher. In addition, the jurors heard testimony from Dr. Cheryl Kuck, along with the testimony of Dr. Romero, the Clements' experts, Nurse Camille DiCostanzo and Dr. Tracey Trotter, and the defendants' expert, Dr. James Greenberg.

{¶19} Nurse Hunnaman testified that she had reported for her 3:00 p.m. to 3:00 a.m. shift around 2:45 p.m. on January 19, 2004. (Vol. III Tr. at 540-41). Nurse Hunnaman stated that typically nurses are taught to only write narrative notes in a patient's chart if they find something in the patient that is out of the ordinary. (Id. at 566). She testified that she was familiar with the concept of jaundice, which is caused by the by-product of the breakdown of red blood cells, known as bilirubin. (Id. at 536). Bilirubin is usually eliminated in a person's body through excretion, but when the bilirubin accumulates, it causes the skin to turn a yellowish color (jaundice). (Id. at 536-38). While Nurse Hunnaman acknowledged that jaundice (or the accumulation of bilirubin) can be caused by

-10-

inadequate nutrition, she stated that it could be caused by other things, such as blood incompatibility, a malfunctioning liver, and an infection. (Id. at 573-74). Moreover, she testified that a good portion of babies get jaundice due to immature livers at birth, and that most of the time the jaundice will resolve on its own. Overall, she said that just because a baby is jaundice does not mean that there is something wrong with the baby's health. (Id. at 580).

{¶20} During her shift, Nurse Hunnaman said she evaluated Owen's vital signs, skin color, feeding, and voiding patterns, which were all normal. (Vol. III Tr. at 529, 532, 542-44, 546-52, 594, 606, 792). She stated that she had been with Dr. Liggett during his examination of Owen, and that afterwards Owen was placed in a warmer because he had felt cool to touch. (Id. at 552-53). After a few hours in the warmer, Owen's temperature stabilized. (Id.). In addition, Nurse Hunnaman said that during his examination of Owen, Dr. Liggett placed a question mark next to the word "jaundice" and ordered additional testing, which Nurse Hunnaman ensured were entered correctly into the system. (Id. at 556-58).

{¶21} Nurse Hunnaman acknowledged that she had weighed Owen later in the evening and that he had dropped from 3120 grams to 2960 grams, which she acknowledged was a 5.2% loss of weight. (Id. at 567-68). She stated that she had not recorded the percentage of weight loss in the records nor had she informed anyone specifically about the weight loss, because it was normal for a newborn to

lose 5-10% over the course of their hospitalization. (Id. at 568). Additionally, she acknowledged that by the time her shift had ended, Owen had not voided for five hours, although she stated that this occurrence was also not uncommon. (Id. at 569-70). She then went through Owen's breastfeedings prior to Dr. Romero's examination, and said that in her nursing opinion everything looked normal: Owen had had about ten feedings, and most of them were labeled "well," meaning that he had stayed on the breast 15-plus minutes. (Id. at 590-92). Nurse Hunnaman concluded by stating that at no time during her shift did she observe Owen to have signs of jaundice, lethargy, poor feeding, or excessive weight loss. (Id. at 599-601).

{¶22} Next, Dr. Romero testified. He again explained that jaundice is a yellowing or yellowish tinge to the skin, which is caused by excess bilirubin (a normal occurring by-product in humans when the red blood cells breakdown). (Vol. III, Tr. at 625, 652). One cause of elevated bilirubin can be a malfunctioning liver that is not adequately processing and getting rid of the bilirubin. (Id. at 654). Another cause of elevated bilirubin in newborns occurs when the baby is not getting normal hydration and nutrition, and thus, cannot excrete the bilirubin from its body. (Id. at 654). Dr. Romero acknowledged that an elevated level of bilirubin, along with jaundice, could be a sign that the baby was not getting adequate nutrition, which could ultimately cause hypoglycemia, or low blood

sugar. (Id. at 657). Typically, when a bilirubin level is around 5 to 7, he stated that one can usually see jaundice on a person's skin, first on their face or head, then as the level increases, jaundice will spread visibly throughout the body. (Id. at 628). Even though one would expect to see jaundice on a person's skin at a level of 7, measuring its visibility is very subjective and visibility varies from person to person. (Id. at 629). Nevertheless, Dr. Romero said that at level 9 some jaundice would be visible. (Id.). Despite the levels of bilirubin, Dr. Romero reiterated that determining whether a baby is visibly jaundice is a subjective determination, and it is something that all doctors and nurses are trained to automatically look for when looking at a baby. (Id. at 719-721).

{¶23} Additionally, Dr. Romero acknowledged that he was familiar with the Bhutani curve, which is used to identify risks and significance of different bilirubin levels in newborns. (Id. at 637). He stated that according to the Bhutani chart, a level of 7.7 would place a newborn in the high intermediate risk zone. (Id.). Moreover, he acknowledged that if Owen's level had been around 15 (high risk zone) at Joint Township Hospital, then if you were to follow the increasing path of the Bhutani curve, at the time Owen had been discharged at LMH, his bilirubin level *may* have been somewhere between 11 and 12. (Id. at 686)(emphasis added). However, Dr. Romero later testified that the bilirubin level does not necessarily move at a constant rate. Moreover, he said that the treatment

for increased bilirubin is phototherapy, which was never given to Owen even when he was at Joint Township Hospital and his level was at 15.6. (Id. at 768-69). Furthermore, Dr. Romero stated that the Bhutani curve was not being used at the time Owen was at LMH; rather, the American Academy of Pediatrics' chart which was being used at that time only indicated that a newborn with a level of 7.7 should be "observed and followed." (Id. at 770-74).

{¶24} With respect to the treatment of Owen, Dr. Romero testified that the three additional tests ordered by Dr. Liggett were common tests to order when a physician was concerned with jaundice, and that two of the tests (the Coombs and Rh tests) had come back negative.[2] (Id. at 648). However, the bilirubin test indicated that the bilirubin was at a level around 7. Dr. Romero acknowledged that you could not know whether the bilirubin level would go up, stay the same, or go down when only one bilirubin reading was done. (Id. at 650). And he also acknowledged that he would have known the results of the bilirubin test when he had performed his physical examination of Owen the next morning. (Id. at 758-

---

[2] The Coombs test checks for whether the newborn's blood is incompatible with the mother's blood, which can be a cause of elevated bilirubin. (Vol. III Tr. at 562). In addition, the Rh test also tests the compatibility of the newborn's blood, but it looks to see whether the mother's antibodies are opposite of the newborn's antibodies and are therefore attacking the newborn's blood cells, causing an increase in bilirubin. (Id. at 563-64).

Case No. 1-09-24

59). However, he said that even though he had failed to note whether Owen was jaundice or not, Dr. Romero stated that he only writes in the positives, thus if there was no note on whether Owen was jaundice, then there was likely no jaundice to report. (Id.). Even at trial, after looking at his notes on Owen's physical examination, Dr. Romero said that there was nothing that gave him concerns as it related to the bilirubin level. (Id. at 764). Although Dr. Romero said that he wished he would have had two numbers on the bilirubin level, he stated that the bilirubin level in and of itself would not have been a reason to have kept Owen more than seventy-two hours. (Id. at 764).

{¶25} With respect to Dr. Romero's other findings during Owen's examination, Dr. Romero testified that he had noted that Owen had a mild recession of his lower chin and that his ears were pavilion, and as a result of these findings, he ordered a chromosome study and made an appointment for the Clements to see a geneticist. (Id. at 661, 665, 676). All of the chromosomal studies came back normal and indicated that there were no problems with Owen's chromosomes. (Id. at 676-77).

{¶26} Dr. Romero went on to explain that when hypoglycemia is an issue, a baby typically presents symptoms of jitteriness, lethargy, persistent low body temperature, cyanosis, poor tone, seizures, apnea, and poor feeding. However, in Owen's case, there was no evidence by way of symptoms or signs that he had

hypoglycemia. (Id. at 795-96). Dr. Romero said that he did not note jaundice, lethargy, or any other complications. (Id. at 664-66, 710-11, 722-33, 746). He did not note that Owen had excessive weight loss, difficulty breathing, or temperature instability. (Id. at 777-78, 795-96). And all of Owen's vital signs, including his temperature were normal, even considering Owen had to be placed in a warmer for a brief period of time. (Id. at 784-89).

{¶27} As far as mothers who are new to breastfeeding their baby, Dr. Romero stated that it is not uncommon for the baby to breast feed "well" several times and then to breast feed "fair" or to have difficulty latching on to the breast. (Id. at 741-42). Here, despite the few expected problems, in Dr. Romero's opinion Owen had been breastfeeding well, had a normal suck, cry and swallow, and had no signs of distress. (Id. at 757-58, 790-92). Moreover, Owen had reasonable amounts of voids (wet diapers), and a reasonable amount of stool passages, which were good signs that everything was working properly. (Id. at 794-95).

{¶28} Finally, Dr. Romero testified that he had never issued a discharge order nor did he ever give a verbal order to discharge Owen. (Id. at 674). And under the circumstances, he said that he may have asked for another bilirubin test to be done, and if the second bilirubin test would have shown a level between 11 and 12, then Owen would have likely not been discharged. However, he reiterated

that his determination would have depended on the whole picture, all of the circumstances with the baby, not just one isolated factor. (Id. at 800, 814, 831).

{¶29} Next, Nurse Baker testified that she had reported for her 3:00 a.m. to 3:00 p.m. shift at LMH on January 20, 2004, and had taken care of Owen's circumcision at 2:15 p.m. (Vol. IV Tr. at 846-47). She said that after Owen's circumcision she assisted in helping Owen breastfeed, and that although she had indicated in his chart that he had breastfed, it was not her handwriting indicating that he had breastfed "fair." (Id. at 849). In addition, she acknowledged that according to Owen's charts she would have known that Owen had not voided for almost 14 hours, which could be a sign that he was not receiving adequate nourishment. (Tr. at 850-51). Moreover, Nurse Baker acknowledged that part of a nurse's duty was to keep accurate medical records and to make entries so that the nurses coming in later could be adequately informed. (Id. at 841, 845). However, except for the note that she had added two days later on January 22nd, she said there were no progress notes (in particular any note indicating Owen's skin color) evaluating Owen from 9:00 p.m. on January 19, 2004, for 22 hours until 7:00 p.m. on January 20, 2004 (which noted that Owen was discharged). (Id. at 855-57). Finally, Nurse Baker concluded by testifying to the following:

> **Q. Well, isn't it correct that the reasonably accepted standards indicate that a nurse should both note and document skin color at discharge?**

**A. If we get assessing and we get pulled away, don't get documentation done and don't remember, we're human. We don't go back to document sometimes. That happens.**

**Q. Am I correct, that it's a deviation from reasonable care not to note and document?**

**A. Yes.**

**Q. And would you agree that if a nurse didn't note and document her findings, she deviated from reasonable care; correct?**

**A. Yes.**

**\* \* \***

**Q. So you agree that –**

**A. Yes.**

**Q. – that failing to note and document –**

**A. Yes.**

**Q. – skin color is a deviation –**

**A. Yes.**

**Q. – for the nurse that discharged him; correct?**

**A. Yes.**

**Q. And failing to identify for a doctor or tell them when a baby is not voiding correctly is also a deviation; correct?**

**A. Yes.**

**Q. And you didn't notify a doctor when you could have seen that blatantly apparent on the chart; correct?**

**A. Yes.**

**Q. So you deviated by not notifying the doctor, correct, if you had looked at the chart?**

**A. Yes.**

(Vol. IV, Tr. at 860-63).

{¶30} Nurse Bollenbacher testified after Nurse Baker. She said that she had reported to LMH on January 20, 2004 for her 3:00 p.m. to 3:00 a.m. shift, at approximately 2:45 p.m. (Vol. IV Tr. at 872). She stated that there were many things that a nurse can do without having a doctor's order, such as ordering a bilirubin test or other similar tests. (Vol. IV, Tr. at 867). However, Nurse

-18-

Case No. 1-09-24

Bollenbacher acknowledged that nurses cannot discharge a baby without a physician's order. (Id.). With respect to discharging Owen, Nurse Bollenbacher testified as follows:

> **Q. One of the things you cannot do without an order is discharge a baby?**
> **A. Correct.**
> **Q. In this case, there is no record of an order allowing you to discharge this baby; correct?**
> **A. I would never discharge a baby without an order.**
> **Q. I didn't ask you that, Ma'am.**
> **A. There is no order in the record.**
> **\* \* \***
> **Q. There can be orders that are given by the a [sic] doctor verbally where you as a nurse write it in and then he signs it later; correct?**
> **A. Correct.**
> **Q. And, in fact, the reasonably accepted standard of care requires if you're talking to a doctor over the phone, which happens all the time in your practice - -**
> **A. Yes.**
> **Q. Correct?**
> **A. Uh-huh.**
> **Q. Requires you to write it in the chart; correct?**
> **A. Uh-huh.**
> **Q. And you can't act on it until you wrote it in the chart; correct?**
> **A. Correct.**

(Vol. IV, Tr. at 867-70). Nurse Bollenbacher testified that she never made the decision to send Owen home. (Id. at 896). Nevertheless, there was no indication in the chart that she ever tried to call a physician to obtain a discharge order for Owen, and as a result, Nurse Bollenbacher admitted that she had not complied with the reasonably accepted standards of care when she had discharged Owen.

-19-

Case No. 1-09-24

(Id. at 899-900). Owen was discharged at 41 hours of age, seven hours before the 48-hour period of time required for a typical discharge. (Vol. III, Tr. at 683-85).

{¶31} Nurse Bollenbacher also stated that she would have known that Owen's bilirubin level was 7.7 from the test results in his chart at the time she took care of Owen, and she admitted that no follow-up test was ever done. (Id. at 890). Moreover, she stated that nurses are normally supposed to assess a baby's skin color every eight hours, but that in Owen's case no one had noted his skin color any time after midnight on January 20th. (Id. at 874, 890). In addition, she stated that she had not noted or evaluated Owen's vitals at the time of his discharge, although she stated that it was not routine or needed; and that she also would have known by Owen's charts that he had lost 5.2% of his body weight since birth. (Id. at 871). Despite the fact that there were none of the above notations in Owen's record, Nurse Bollenbacher later testified that while not everything gets marked down, that does not mean that the baby was not evaluated. (Id. at 903-04). Moreover, she emphasized that while documentation is important, patient care always comes first. (Id.). In response to whether nurses in reality mark down everything, Nurse Bollenbacher stated as follows:

> **[W]e are in the rooms checking on the babies all the time. I mean, every time we walk in a room, we're looking at the baby. Assisting with breastfeeding, doing teaching, taking care of mother, even if we're called in there for something, mom wants pain medication, we're always looking at the baby. We're trained, it's just an automatic thing.**

**Even in the mall, I see a baby, I can't help but look at him and like make sure everything looks normal on him, including color. I mean, it's just an automatic thing after all these years.  \* \* \* It's an automatic thing for me to always check babies.**

(Id. at 903).

{¶32} Dr. Cheryl R. Kuck, a general pediatrician, testified that she was working at Joint Township Hospital on January 21, 2004, when Owen was brought to the hospital's emergency room.  (Id. at 968-970).  She said that when she first saw Owen, he was just laying there, he was cold, was not responding well, and he was jaundiced: all indications that he was a very sick child.  (Id. at 972).  After they were able to get blood drawn, Owen started having seizures.  (Id. at 973-74). The tests revealed that Owen's glucose level was at a life-threatening level (between zero and one), so Dr. Kuck put a tube down into his stomach to try to increase his blood sugar.  (Id. at 973-76).  Dr. Kuck explained that the brain requires glucose, which it uses as its source of energy, so low levels of glucose can cause injury to the brain.  (Id. at 977).  After Dr. Kuck and the Joint Township Hospital staff were able to stabilize Owen, they transferred him over to Dayton Children's Hospital.  (Id. at 986-87).  Dr. Kuck stated that as a result of low blood sugar, or hypoglycemia, Owen sustained severe permanent brain damage.  (Id. at 990).  She also testified that she is Owen's current physician and explained his present medical condition and how it has impacted his physical and mental capabilities.  (Id. at 990-1000).  Overall, she concluded that Owen's brain injury

and disabilities were permanent and were the result of the low blood sugar he had exhibited at Joint Township Hospital. (Id. at 999-1000).

{¶33} Nurse Camille DiCostanzo testified as the Clements' nursing expert. She stated that typically newborns are kept in a hospital for 48-hours, and anything less than 48-hours would be considered an early discharge, which should be done only in compliance with the requisite criteria and conditions. (Vol. V, Tr. at 1149-151). After reviewing the medical records and depositions in this case, Nurse DiCostanzo opined that it was a deviation from the reasonable standard of care for LMH, through its employees, to have allowed Owen to be discharged early. (Id. at 1152). She stated that she found certain things in Owen's medical record troubling that would not have warranted an early discharge. (Id. at 1194). In particular, even though she indicated that Dr. Romero and Dr. Liggett did not note that there were any concerns regarding a 5% weight loss, she believed that Owen's 5% weight loss was significant and alone should have kept the baby in the hospital. (Id. at 1194, 1274). In addition, she believed that the medical record demonstrated that there were problems with the breastfeeding and voiding/stooling, along with the fact that there was a noted question of jaundice and a recessed chin. (Id. at 1194-95).

{¶34} On cross-examination, Nurse DiCostanzo clarified that her concern with respect to Owen's breastfeeding was with the latching at the time of the

feeding, not the frequency of the breastfeedings. (Id. at 1249). But, she acknowledged that next to most of the breastfeed notations there was an indication that it was "well" or "fair," and most of them were "breastfed well," signifying that there was little to no assistance needed. (Id. at 1252-58). Furthermore, there were additional notations made by the nurses indicating whether there was a good sucking, audible swallowing, difficulty in latching, and sleepiness. (Id. at 1258-70). And Nurse DiCostanzo agreed that it is not unusual for there to be problems with breastfeeding, especially with first-time mothers. (Id. at 1243).

{¶35} Nurse DiCostanzo also acknowledged that inadequate documentation happens more often than not in the nursing profession. (Id. at 1241). The overall question then becomes what is the impact on care and subsequent injury of the inadequate documentation, because not all inadequate documentation impacts patient care. (Id. at 1241-42). Nurse DiCostanzo testified that if someone were to follow the guidelines set forth in the American Academy of Pediatrics (hereinafter "AAP") that would be reasonable and within the standard of care. (Id. at 1246). And as it related to voiding/stooling and early discharge, according to the criteria set by the AAP a newborn only needs to have urinated and passed at least one stool, which Owen had met. (Id. at 1273). Despite these facts, Nurse DiCostanzo still maintained her opinion that based on

the concerns she had noted previously, Owen should not have been discharged early.

{¶36} The final two relevant witnesses presented were the expert doctors called by the Clements and the defendants: Dr. Tracey Trotter and Dr. James Greenberg, respectively. Dr. Tracey Trotter testified that discharging Owen had deviated from the reasonable standard of care, and had Owen been kept longer, his brain injury could have been avoided. (Vol. VI Tr. at 1395). Dr. Trotter stated that there were several external factors that he believed indicated that glucose may have been a problem: Owen's elevated level of bilirubin, significant weight loss, lack of feeding, and poor output. (Id. at 1434-43). He said that although no glucose check was ever performed in this case, these were indications that a glucose test should have been performed. (Id. at 1434-43). Nevertheless, in Dr. Trotter's opinion, since it was clear to him that Owen had not been eating and voiding properly, a glucose test would have likely revealed a borderline glucose level, which he said would have gotten the attention of medical professionals. (Id. at 1435-36). Again, assuming that this level would have been noticed, Dr. Trotter testified that then the hospital would have attempted to keep Owen's glucose level within a reasonable range, and could have prevented it from dropping down to zero, thus ultimately preventing Owen's injury. (Id. at 1437-40). He stated that he believed that Owen's weight loss, the increased level of bilirubin, the recessed

chin, lack of voidings/stoolings were all consistent with inadequate nutrition, and that one way to get rid of the bilirubin is having good nutrition. (Id. at 1420, 1445). Moreover, he testified that by using the Bhutani curve as a predictor of the rise of bilirubin, when Owen was discharged from LMH his bilirubin level would have been somewhere between 11 and 12. (Id. at 1516).

{¶37} On cross-examination, Dr. Trotter acknowledged that Owen's injury was caused by transient hypoglycemia, and no one was able to determine why Owen became hypoglycemic. (Id. at 1473). Similarly, Dr. Trotter said that quite often the cause of an infant's transient hypoglycemic episode is never determined, and not all babies will show symptoms of hypoglycemia before their symptoms become severe. (Id. at 1438, 1514). Nevertheless, Dr. Trotter concluded that, regardless of what the cause was of Owen's transient hypoglycemia, in order to have prevented the hypoglycemia from causing brain injuries, there should have been follow-ups on the bilirubin, lack of voiding, and weight loss. (Id. at 1515).

{¶38} Finally, Dr. James Greenberg testified as the defendants' expert witness. He stated that although the underlining cause of Owen's hypoglycemia was never determined, the hypoglycemia was not related to the levels of bilirubin nor was the hypoglycemia related to the alleged lack of adequate nutrition. (Vol. XI Tr. at 2031-32). Dr. Greenberg said he had no concerns with Owen's breastfeeding, found the 5% weight loss to be within a normal range, and said that

he did not have any concerns with Owen's voiding and stooling. (Id. at 2036-47, 2059-71, 2075-77). In addition, with respect to bilirubin, high levels of bilirubin are treated with a treatment called phototherapy, which is a light used to turn the bilirubin into a chemical that can be excreted by the baby. (Id. at 2050). He stated that the Bhutani chart has now been officially adopted by the APP (although he said that the APP's original chart used by the defendants was consistent with the Bhutani chart), and it is used to determine the risk that a baby will require phototherapy treatment for jaundice. (Id. at 2054-58, 2121-26). However, Dr. Greenberg said that the Bhutani chart was not designed to be used the way the Clements were using the chart, which was as a way to predict the level the bilirubin in the future. (Id. at 2058, 2123-26). Rather, Dr. Greenberg stated that the purpose of the Bhuntani chart was to only predict the need for treatment (phototherapy, or in the worse cases, a transfusion). With respect to Owen and his 7.7 level of bilirubin, Dr. Greenberg stated that although he would have been concerned with whether Owen needed phototherapy, he would have had no concerns as far as discharging him with a level of 7.7. (Id. at 2058-59).

{¶39} Again, Dr. Greenberg reiterated that based on Owen's medical records, he had no concerns regarding Owen's intake: the breastfeedings were normal, the voiding and stoolings were normal, and the 5% weight loss was within the normal range of expected weight loss in newborns. (Id. at 2059-81). With

respect to the symptoms of hypoglycemia, Dr. Greenberg stated that these included lethargy, poor feeding, jittery movements, low tone, limpness, hypothermia, and seizures. (Id. at 2048). Overall, Dr. Greenberg testified that as far as what was indicated in the medical records, there were no concerns regarding Owen's intake/breastfeeding and no concerns with hypoglycemia. (Id. at 2081).

{¶40} Moreover, Dr. Greenberg stated that even if there had been problems with Owen's intake, he opined that there were two reasons that he believed the hypoglycemia had been metabolic and not related to a lack of nutrition. (Id. at 2082). First, Dr. Greenberg stated that when hypoglycemia is the result of inadequate nutrition, because there is already stored glucose in a newborn's body when it is born, if the baby does not get adequate nutrition from birth, one would expect to see the glucose level decrease, maybe to a level of 20 or 30. (Id. at 2085). Here, the level was between one and zero, which suggested an abnormal metabolic process or regulation of the maintenance of glucose in Owen's body. Second, Dr. Greenberg said that despite the fact that the hospitals had been providing good nutrition and providing good glucose to Owen, Owen's glucose levels were difficult to manage, which indicated again that his hypoglycemia had been metabolic and not nutritional. Despite the subsequent hospitals' glucose treatment, there were several periods of time, over the course of a few days, where Owen had had subsequent episodes of hypoglycemia: his glucose level would rise

into a normal range (92), and then it would drop suddenly to a dangerous level (23). (Id. at 2082-88). If Owen's hypoglycemia had been the result of inadequate nutrition, Dr. Greenberg testified that the subsequent hospitals glucose treatment would have immediately resolved the hypoglycemia. (Id. at 2084). However, here Owen's glucose level "bounce[d] all over the place," despite the hospitals attempts to stabilize the glucose level. (Id. at 2087-88).

{¶41} On cross-examination Dr. Greenberg acknowledged that the APP's guideline states that the typical newborn's weight loss after birth should not be more than 7%, and here Owen had loss about 5% of his newborn weight after 22 hours. (Id. at 2102-03). Moreover, Dr. Greenberg admitted that he did not know Owen's weight at discharge because LMH had failed to weigh Owen again; however, when Owen was weighed at Joint Township Hospital, his weight was the same as it had been at LMH. (Id. at 2102-15). In addition, he stated that Owen's bilirubin level at Joint Township Hospital had been 15.6, which at that level, using any of the acceptable charts a physician would be considering the phototherapy treatment. (Id. at 2128-29). Although, Dr. Greenberg later clarified that neither one of the bilirubin curves could be used to predict hypoglycemia. (Id. at 2158). Furthermore, Dr. Greenberg admitted that the neurologists and endocrinologists at Dayton Children's Hospital never found an inborn error of metabolism or a genetic cause for Owen's hypoglycemia. (Id. at 2134). While Dr. Greenberg

agreed with the statement that occasionally hypoglycemia may be asymptomatic in newborns and that one would certainly want to treat the hypoglycemia once it was diagnosed despite the lack of symptoms, here Owen had not exhibited any of the symptoms of hypoglycemia nor did he have any prenatal factors that would have led to one doing a glucose check. (Id. at 2138, 2145-51, 2162). Finally, Dr. Greenberg's testimony concluded, as follows:

> **A.** **And if Owen was treated before his hypoglycemia got to the level that it did, zero, there's a good chance he would not have been injured; correct?**
> **Q.** **Actually, I don't agree with that based on my experience and looking at the record of how difficult it was to maintain his blood sugars. I don't have an opinion, at least to a reasonable degree of medical certainty, that he would have done well even if his treatment had been initiated earlier.**
> **\* \* \***
> **Well, because of the intractable nature of his low blood sugars over a period of several days, that is my impression. I've managed babies with hyperinsulinism and hypoglycemia and this is the typical pattern.**

(Id. at 2162-63).

**{¶42}** The jury heard all of the above testimony and found for Nurse Hunnaman, Nurse Baker, and Nurse Bollenbacher, and for LMH by and through its three nurses. Specifically, the jury found that only Nurse Baker and Nurse Bollenbacher had deviated from the acceptable standard of care, but that despite these deviations, their conduct had not been the proximate cause of Owen's injury. Nevertheless, the Clements argue that the jury's verdicts were against the manifest

weight of the evidence given the nurses' admissions, plus the fact that the defendant's failed to present a contradictory nursing expert. The Clements claim that the evidence can only lead to one conclusion: that the nurses, and also thereby LMH, were negligent and thus liable for Owen's injury. We disagree.

{¶43} Despite the Clements' assertions that Nurse Baker and Nurse Bollenbacher admitted their negligence during trial, after reviewing their testimony, we find that the nurses' admissions were not outright admissions of liability; rather, they admitted to negligent conduct, but *not* that their negligence was the proximate cause of Owen's injury. They *only* stated that their failures to document, and the discharge of Owen without a written order, fell below the acceptable standards of care. Again, in order to establish a medical malpractice claim, the Clements had to prove by a preponderance of the evidence the existence of a standard of care within the medical community, a breach of that standard of care by the defendants, *and proximate cause* between the medical negligence and the injury sustained. *Young-Hatten v. Taylor*, 10th Dist. No. 08AP-511, 2009-Ohio-1185, ¶29, citing *Jones v. Schirmer* (July 17, 2001), 10th Dist. No. 00AP-1330. Failure to prove proximate cause, despite evidence of breach, is fatal to one's medical malpractice action. And the law is clear that a deviation from the applicable standard of care, along with the existence of an injury, does not alone sufficiently establish a causal connection between the two. *Rockwell v. Queen*

*City Bottling Co.* (1943), 73 Ohio App. 42, 53 N.E.2d 528, citing *Flamm v. Coney Island Co.* (1934), 49 Ohio App. 122, 195 N.E. 401, paragraph three of the syllabus.

**{¶44}** In addition, we do not find the defendants' failure to present a nursing expert dispositive. The Clements' nursing expert, Nurse DiCostanzo, testified that in her expert opinion Owen should not have been discharged early from LMH. This opinion only went to whether the nurses had breached their standard of care, not to whether such breaches were the proximate cause of Owen's injury. Her testimony failed to establish how Owen's injury was a natural and continuous consequence of failing to keep Owen at LMH for the requisite 48-hours. While she did testify that she had concerns about Owen's medical condition based on certain problems she had found (5% weight loss, breastfeedings, voiding/stoolings), she failed to offer an opinion as to how those concerns and the nurses' breaches proximately caused Owen's injury.

**{¶45}** Nevertheless, even if Nurses Baker, Bollenbacher, and DiCostanzo's testimony offered some proof that a reasonable trier of fact could have concluded that the nurses' conduct was the proximate cause of Owen's injury, under a manifest weight argument we do not weigh the evidence nor judge the credibility of the witnesses. Our role is simply to determine whether there is relevant, competent, credible evidence upon which the fact finder could base its judgment.

Case No. 1-09-24

*Wells Fargo Financial Leasing, Inc. v. Rinard*, 5th Dist. No. 07-CA-8, 2008-Ohio-437. Here, after reviewing the whole record, we believe that there was competent, credible evidence to support the jury's conclusions.

{¶46} While, Nurse DiCostanzo and Dr. Trotter believed that Owen's records showed the following problems: significant weight loss, inadequate nutrition from the breastfeedings, inadequate number of voidings/stoolings, and an elevated level of bilirubin; Nurse Hunnaman, Dr. Romero, and Dr. Greenberg believed that Owen's records did not demonstrate that Owen was having problems, rather they believed that his records showed that he was a normal, healthy baby. Nurse Hunnaman, Dr. Romero, and Dr. Greenberg testified that the 5% loss of weight had been within the normal range of expected weight loss among newborns. Moreover, when looking at the records, despite a few times where there were latching problems, which all of the witnesses said was to be expected with first-time mothers, none of them believed that Owen had been having problems breastfeeding – most of the breastfeeds were labeled "well," and there were notations that there had been a normal suck, cry, and swallow. Moreover, even if there had been issues concerning the breastfeedings, Dr. Greenberg opined that Owen's hypoglycemia was not likely related to any nutritional problems considering the difficulty in controlling his blood sugar over a period of a few days. With respect to the voiding and stooling, Dr. Romero and

Dr. Greenberg testified that Owen had had reasonable amounts of voids and stools while he was at LMH, which was further indication that everything was working fine. Even Nurse DiCostanzo admitted that following the APP's guidelines for early discharges would be reasonable, and in Owen's case, he had had the requisite number of voidings and stoolings to comply with early discharge.

**{¶47}** In regards to the elevated bilirubin, several witnesses testified that there were other causes of elevated bilirubin besides inadequate nutrition, and that jaundice (caused by elevated bilirubin) was also not an uncommon occurrence in newborns. Dr. Trotter and Nurse DiCostanzo believed that by using the Bhutani chart one could have predicted Owen's bilirubin level, which had been 7.7 at LMH, would increase later up to 15.6 at Joint Township Hospital. However, Dr. Romero and Dr. Greenberg stated that the bilirubin chart was not designed to predict future levels of bilirubin; rather, its purpose was to identify the risk level of the newborn for a phototherapy treatment. In addition, it was clear that phototherapy is the most common treatment for elevated bilirubin levels, and Owen was never given this treatment. Finally, although Dr. Romero stated that he would have liked to have had another bilirubin test prior to discharging Owen, Dr. Greenberg testified that he would have felt comfortable discharging Owen with a bilirubin level of 7.7 because Owen's subsequent hypoglycemia had not been related to his elevated levels of bilirubin.

{¶48} Overall, neither Nurse Hunnaman, Dr. Romero, nor Dr. Greenberg observed or found that Owen had exhibited jaundice, lethargy, jitteriness, low tone, limpness, seizures, low body temperature (all signs of hypoglycemia), during his time at LMH. While there were no notations in Owen's record proving that these things were negative, it was clear from the LMH caretakers that only those things which are found to be abnormal are marked down in a patient's chart.

{¶49} We acknowledge that the Clements presented some evidence that the LMH nurses had breached their standard of care and that their breaches were the proximate cause of Owen's injury. However, there was also evidence to the contrary presented through the testimony of Nurse Hunnaman, Dr. Romero, and Dr. Greenberg, and it was certainly within the province of the jury to believe their testimony over the testimony of Nurse DiCostanzo and Dr. Trotter. We will not second guess the jury's determinations of weight and credibility.

{¶50} Accordingly, because we find that there was competent, credible evidence to support the jury's conclusions that the three nurses were not the proximate cause of Owen's injury, we find that the jury's verdicts, that the three nurses, and also thereby LMH, were not negligent for Owen's injury, were not against the manifest weight of the evidence.

{¶51} The Clements' fourth assignment of error is, therefore, overruled.

## PLAINTIFFS' ASSIGNMENT OF ERROR NO. I

**THE TRIAL [sic] ERRED, AS A MATTER OF LAW, BY REFUSING TO GRANT A DIRECTED VERDICT IN FAVOR OF PLAINTIFF-APPELLANTS UPON THE ADMITTED NEGLIGENCE OF THE NURSES EMPLOYED BY DEFENDANT-APPELLEE, LIMA MEMORIAL HOSPITAL.**

**{¶52}** In their first assignment of error, the Clements argue that the trial court erred by failing to grant them a directed verdict when the nurses had already admitted their conduct constituted negligence.

**{¶53}** A motion for a directed verdict presents a question of law. *Good Year Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶4, citing *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 280 N.E.2d 896, paragraph three of the syllabus; *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 119, 671 N.E.2d 252. As such, we review the trial court's decision to grant or deny the motion de novo. Id. Civ.R. 50(A)(4) provides that a trial court shall grant a party's motion for directed verdict if, after construing the evidence most strongly in favor of the non-moving party, "reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to [the non-moving party]." In making this determination, the trial court must decide whether the non-moving party presented evidence of substantial probative value in support of its claim. *Good Year Tire & Rubber Co.*, 2002-Ohio-2842, at ¶3, citing *Ruta v. Breckenridge-Remy Co.* (1982),

69 Ohio St.2d 66, 69, 430 N.E.2d 935. It is clear that "'if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied." *Ramage*, 64 Ohio St.3d at 109, citing *Kellerman v. J.S. Durig Co.* (1964), 176 Ohio St. 320, 199 N.E.2d 562. If the non-moving party cannot present "substantial competent evidence" from which reasonable minds could draw different conclusions, then the motion should be granted. *Shreve v. United Elec. & Constr. Co. Inc.*, 4th Dist. No. 01CA2626, 2002-Ohio-3761, ¶26.

{¶54} Again, in order to establish a medical malpractice claim, the Clements had to prove by a preponderance of the evidence the existence of a standard of care within the medical community, a breach of that standard of care by the defendants, *and proximate cause* between the medical negligence and the injury sustained. *Young-Hatten*, 2009-Ohio-1185, at ¶29, citing *Jones v. Schirmer* (July 17, 2001), 10th Dist. No. 00AP-1330. See, also, *Bruni v. Tatsumi*, 46 Ohio St.2d at 131-32. With respect to nurses and negligence actions, "expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and that the nurse's negligence, if any, was the proximate cause of the patient's injury." *Ramage*, 64 Ohio St.3d 97, paragraph one of the syllabus. If the plaintiffs failed to offer expert medical testimony to prove that the injury was proximately caused by the deviation from the standard of care, a directed verdict

Case No. 1-09-24

for the defendant is proper. *Schwimmer v. Bowsher* (Feb. 25, 1993), 10th Dist. No. 92AP-1140, discretionary appeal denied in *Schwimmer v. Bowsher* (1993), 67 Ohio St.3d 1411, 615 N.E.2d 1045.

{¶55} The Clements argue that they were entitled to a directed verdict based upon the admitted negligence by the nurses. The parties agree about the applicable nursing standard of care in this case, which includes "a duty to keep the attending physician informed of a patient's condition so as to permit the physician to make a proper diagnosis of and devise a plan of treatment for the patient." *Albain v. Flower Hosp.* (1990), 50 Ohio St.3d 251, 265, 553 N.E.2d 1038, overruled on other grounds by *Clark v. Southview Hosp. & Family Health Ctr.* (1994), 68 Ohio St.3d 435, 628 N.E.2d 46. In addition, "[i]n order to fulfill the foregoing duty, nurses must perform a competent nursing assessment of the patient to determine those signs and symptoms presented by the patient that are significant" in relation to the physician's tasks of diagnosis and treatment. *Berdyck v. Shinde* (1993), 66 Ohio St.3d 573, 580, 613 N.E.2d 1014. The issue regarding the Clements' assignment of error is whether the nurses' alleged admissions during the trial warranted a directed verdict in their favor. In particular, they claim that at trial, Nurse Baker and Nurse Bollenbacher admitted that they had violated their nursing standard of care, and that as a result, they were entitled to a directed verdict.

-37-

Case No. 1-09-24

{¶56} In particular, the Clements claim that the following testimony by

Nurse Baker was an admission of her negligence:

> Q. **Well, isn't it correct that the reasonably accepted standards indicate that a nurse should both note and document skin color at discharge?**
> A. **If we get assessing and we get pulled away, don't get documentation done and don't remember, we're human. We don't go back to document sometimes. That happens.**
> Q. **Am I correct, that it's a deviation from reasonable care not to note and document?**
> A. **Yes.**
> Q. **And would you agree that if a nurse didn't note and document her findings, she deviated from reasonable care; correct?**
> A. **Yes.**
> * * *
> Q. **And failing to identify for a doctor or tell them when a baby is not voiding correctly is also a deviation; correct?**
> A. **Yes.**
> Q. **So you deviated by not notifying the doctor, correct, if you had looked at the chart?**
> A. **Yes.**

(Vol. IV, Tr. at 860-63).

{¶57} With respect to discharging Owen, Nurse Bollenbacher testified as

follows:

> Q. **One of the things you cannot do without an order is discharge a baby?**
> A. **Correct.**
> Q. **In this case, there is no record of an order allowing you to discharge this baby; correct?**
> A. **I would never discharge a baby without an order.**
> Q. **I didn't ask you that, Ma'am.**
> A. **There is no order in the record.**
> * * *

> **Q. There can be orders that are given by the a [sic] doctor verbally where you as a nurse write it in and then he signs it later; correct?**
> **A. Correct.**
> **Q. And, in fact, the reasonably accepted standard of care requires if you're talking to a doctor over the phone, which happens all the time in your practice - -**
> **A. Yes.**
> **Q. Correct?**
> **A. Uh-huh.**
> **Q. Requires you to write it in the chart; correct?**
> **A. Uh-huh.**
> **Q. And you can't act on it until you wrote it in the chart; correct?**
> **A. Correct.**

(Vol. IV, Tr. at 867-870). There was no indication in the chart that she ever tried to call a physician to obtain a discharge order for Owen, and as a result, Nurse Bollenbacher admitted that she had not complied with the reasonably accepted standards of care when she had discharged Owen. (Id. at 899-900). She also stated that she would have known that Owen's bilirubin level was 7.7 from the test results in his chart at the time she took care of Owen, and that no follow-up test was ever done. (Id. at 890). Moreover, she stated that nurses are normally supposed to assess a baby's skin color every eight hours, but that in Owen's case no one had noted his skin color any time after midnight on January 20th. (Id. at 874, 890). In addition, she stated that she had not noted or evaluated Owen's vitals at the time of his discharge, although she stated that it was not routine or

needed, and that she would have known by Owen's charts that he had lost 5.2% of his body weight since birth. (Id. at 871).

{¶58} The Clements state that under *Winkler v. City of Columbus* (1948), 149 Ohio St. 39, 77 N.E.2d 461, there is an affirmative duty on a trial court to sustain a motion for directed verdict where a party has through its case in chief or on cross-examination admitted negligence. In *Winkler*, the Court reasoned that "where plaintiff herself makes admissions that her negligence contributed directly to her injury (one of the precise ultimate facts in issue) a question of law * * * is raised and the trial court has a plain duty to sustain a motion for directed verdict." Id. at 43-44. However, we do not believe that the trial court erred when it overruled the Clements' motion for a directed verdict.

{¶59} Again as we stated above, despite the Clements' assertions that Nurse Baker and Nurse Bollenbacher admitted their negligence during trial, we find that the nurses' admissions were not solely proof of their negligence *and* that their negligence was the proximate cause of Owen's injury. They *only* stated that their failures to document and the discharge of Owen without a written order fell below the acceptable standards of care. They made no mention of whether they believed their negligence proximately caused Owen's injury. Moreover, unlike the plaintiff's admissions in *Winkler*, the nurses' admissions of their breaches of duty were not also evidence that their breaches *clearly* contributed directly to

Case No. 1-09-24

Owen's injury. See *Winkler*, 149 Ohio St. at 39-44 (plaintiff's admissions that she knew of the dangerous condition in the sidewalk but chose to walk on it anyways, were of a nature that they showed clearly that her negligence contributed directly to her injury [one of the precise, ultimate facts in issue], thus defendant's motion for directed verdict should have been granted.)

{¶60} The law is clear that the existence of an injury and a deviation from the applicable standard of care are alone insufficient to establish a causal connection between the two. *Rockwell v. Queen City Bottling Co.* (1943), 73 Ohio App. 42, 53 N.E.2d 528, citing *Flamm v. Coney Island Co.* (1934), 49 Ohio App. 122, 195 N.E. 401, paragraph three of the syllabus. While there may have been clear admissions that the nurses conduct fell below the applicable standard of care, here there was conflicting evidence as to the issue of proximate cause. The Clements introduced evidence by way of its expert witnesses that Owen should not have been discharged early, because there were signs that he was sick at LMH (5% weight loss, inadequate nutrition, elevated bilirubin level, decreased numbers of voiding and stooling). However, there was also evidence provided by Owen's LMH caretakers that these were not medically significant and were common occurrences in newborns. Overall, when viewing the above evidence (excluding the defense doctor's testimony) in a light most favorable to the defendants, reasonable minds could have come to different conclusions that despite the nurses'

-41-

admissions, the nurses and LMH were not the proximate cause of Owen's brain injury. Therefore, the trial court did not err when it denied the Clements' motion for directed verdict.

{¶61} The Clements' first assignment of error is, therefore, overruled.

{¶62} Because the defendants raise an issue with respect to their motion for directed verdict, we will address their cross-assignment of error next.

## DEFENDANTS' CROSS ASSIGNMENT OF ERROR

**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY OVERRULING DEFENDANTS/APPELLEES MOTION FOR A DIRECTED VERDICT AFTER PLAINTIFF FAILED TO PRODUCE EVIDENCE OF PROXIMATE CAUSE.**

{¶63} Similarly, in their cross-assignment of error, the defendants argue that the trial court erred by failing to grant them a directed verdict because the Clements had failed to establish a causal link between the allegations of poor breastfeeding, lack of voiding, jaundice, and weight loss and Owen's hypoglycemia. For similar reasons stated in the Clements' first assignment of error, we disagree with the defendants.

{¶64} Here, the defendants argue that the Clements failed to offer any evidence that the nurses and LMH's conduct proximately caused Owen's brain injury. In particular, the defendants claim that since the Clements experts could not offer any explanation as to the underlying cause of Owen's hypoglycemia, they could not state to any degree of medical probability how the outcome would

have been different if Owen had not been discharged early. However, when looking at the evidence in a light most favorable to the Clements, we find that the Clements' experts provided at least some competent, credible evidence upon which reasonable minds could have reached different conclusions as far as whether Owen should have been released from LMH. Dr. Trotter specifically testified that had Owen not been discharged from LMH and had more tests been ordered, Owen's brain injury, which was caused by hypoglycemia, could have been avoided. Furthermore, Nurse DiCostanzo and Dr. Trotter testified as to concerns that they had found with Owen's medical condition, which should have put the nurses and LMH on notice that Owen was not a healthy newborn (5% weight loss, inadequate nutrition, elevated bilirubin level, decreased numbers of voiding and stooling). Thus, when considering this evidence in a light most favorable to the Clements, we believe that reasonable minds could have come to different conclusions as to whether the LMH nurses and LMH were the proximate cause of Owen's injury. Thus, the trial court did not err when it denied the defendants' motion for directed verdict.

{¶65} The defendants' cross-assignment of error is, therefore, overruled.

## PLAINTIFFS' ASSIGNMENT OF ERROR NO. II

**THE TRIAL JUDGE ABUSED HIS DISCRETION IN ALLOWING A PHYSICIAN TO BE CALLED AS AN EXPERT TO CONFUSE THE PROCEEDINGS BY FURNISHING OPINIONS WHICH WERE IRRELEVANT.**

{¶66} In their second assignment of error, the Clements argue that the trial court abused its discretion when it allowed the defendants to call Dr. Greenberg as an expert witness because his testimony was irrelevant and confusing. While the Clements do not dispute the trial court's ruling that Dr. Greenberg could not render opinions with respect to the nursing standard of care, the Clements do not believe that Dr. Greenberg should have been allowed to offer any explanations as to what could have been concerning to him as a doctor under the facts of this case. The Clements argue that Dr. Romero had already been dismissed from the case, thus the only question that remained was whether the LMH nurses had complied with the duty of care. Therefore, Dr. Greenberg's testimony was irrelevant and highly prejudicial under the circumstances.

{¶67} "The admission of evidence is generally within the sound discretion of the trial court, and a reviewing court may reverse only upon the showing of an abuse of that discretion." *Peters v. Ohio State Lottery Comm.* (1992), 63 Ohio St.3d 296, 299, 587 N.E.2d 290. An abuse of discretion constitutes more than an error of law or judgment and implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. Id.

{¶68} The Clements' assignment of error specifically concerns the admissibility of Dr. Greenberg's testimony. Only relevant evidence is admissible at trial. Evid.R. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Nevertheless, even relevant evidence can be inadmissible when it is unduly prejudicial, confusing, or misleading to the jury. Evid.R. 403.

{¶69} Overall, we find that contrary to the Clements' statement, Dr. Romero *was* still a party to the case when the defendants called Dr. Greenberg to testify at trial. Thus, Dr. Greenberg's testimony was significantly relevant with respect to whether Dr. Romero's actions constituted a breach of his professional standard of care. In addition, we find that while Dr. Greenberg could not offer any opinions as to the standard nursing practices, his testimony was relevant as far as Owen's condition at discharge. Therefore, we find that the trial court did not abuse its discretion when it allowed Dr. Greenberg to testify at trial.

{¶70} The Clements' second assignment of error is, therefore, overruled.

## PLAINTIFFS' ASSIGNMENT OF ERROR NO. III

**THE JURY WAS FURNISHED WITH AN INCORRECT STATEMENT OF OHIO LAW, AND PLAINTIFF-APPELLANTS' BURDEN OF PROOF WAS BROADENED SUBSTANTIALLY, WHEN THE TRIAL JUDGE READ THE UNPRECEDENTIED "FORESEEABILITY" INSTRUCTION**

**WHICH HAD BEEN DEVISED BY DEFENDANT-APPELLEES.**

**{¶71}** In their third assignment of error, the Clements argue that the jury was given incorrect statements of law, and because of the erroneous and misleading charge, the Clements are entitled to a new trial. In particular, the Clements claim that the charge on "foreseeability" was an incorrect statement of Ohio law, and that it essentially created a higher burden for the Clements in their medical malpractice case by making it appear that "foreseeability" was an additional element that they had to prove.

**{¶72}** The trial court has the duty to instruct the jury on the applicable law on all issues raised by the pleadings and evidence, and it must give jury instructions that correctly and completely state the law. *Pallini v. Dankowski* (1969), 17 Ohio St.2d 51, 53, 245 N.E.2d 353; *Marshall v. Gibson* (1985), 19 Ohio St.3d 10, 12, 482 N.E.2d 583; *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 591, 575 N.E.2d 828; *Groob v. Keybank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶32. A jury charge should be "a plain, distinct and unambiguous statement of the law as applicable to the case made before the jury by the proof adduced." *Marshall*, 19 Ohio St.3d at 12, citing *Parmlee v. Adolph* (1875), 28 Ohio St. 10, paragraph two of the syllabus. Furthermore, "[a] charge ought not only be correct, but it should also be adapted to the case and so

explicit as not to be misunderstood or misconstrued by the jury." Id., citing *Aetna Ins. Co. v. Reed* (1877), 33 Ohio St. 283, 295.

{¶73} Generally, trial courts have discretion in determining how to charge a jury, and thus our review of the trial court's decision would typically be under an abuse of discretion. *American States Ins. Co. v. Caputo* (1998), 126 Ohio App.3d 401, 408, 710 N.E.2d 731. However, whether jury instructions correctly state the law is a question of law that we review de novo. *State v. Calderon*, 10th Dist.No. 05AP-1151, 2007-Ohio-377, ¶55. Although an instruction may not be a full and comprehensive statement of the law, as long as it correctly states the law pertinent to the issues raised in the case, its use is not reversible error. *Henderson v. Spring Run Allotment* (1994), 99 Ohio App.3d 633, 638, 651 N.E.2d 489. And while an inadequate jury instruction that misleads the jury constitutes reversible error, "misstatements and ambiguity in a portion of the instructions will not constitute reversible error unless the instructions are so misleading that they prejudicially affect a substantial right of the complaining party.'" *Haller v. Goodyear Tire Rubber Co.*, 9th Dist. Nos. 20669, 20670, 2002-Ohio-3187, ¶19, quoting *Wozniak v. Wozniak* (1993), 90 Ohio App.3d 400, 410, 629 N.E.2d 500 (internal citations omitted). See, also, *Kokitka v. Ford Motor Co.* (1995), 73 Ohio St.3d 89, 93, 652 N.E.2d 671; *Groob*, 2006-Ohio-1189, at ¶32; *Marshall*, 19 Ohio St.3d at 12, citing *Columbus Ry. Co. v. Ritter* (1902), 67 Ohio St. 53, 65 N.E. 613.

**{¶74}** Here, the Clements take issue with the highlight portions of the trial court's instruction to the jury on "foreseeability," which stated:

> **Reasonable foreseeability of harm is *an essential ingredient* of negligence in the action brought against the defendants. The test for foreseeability is not whether a defendant should have foreseen the injury exactly as it happened to the specific person. The test is whether under all the circumstances a reasonably prudent person would have anticipated that injury was likely to result to someone from the act or failure to act. The test, therefore, is one of foreseeability or *foresight, not hindsight*.**

(emphasis added).

**{¶75}** With respect to the Clements' issue with the phrase "foresight, not hindsight," we find that this was not an inaccurate statement regarding the law. Even though this language is absent from the Ohio Jury Instructions (hereinafter "OJI"), the OJI instructions are only models or guidelines and are not mandatory. *State v. Burchfield* (1993), 66 Ohio St.3d 261, 263, 611 N.E.2d 819. With respect to foreseeability, the question is one looking forward from the time of the purported negligent action (foresight), not looking back after the injury has occurred (hindsight). *Grabill v. Worthington Industries, Inc.* (1994), 98 Ohio App.3d 739, 744, 649 N.E.2d 874 ("[i]t is nearly always easy, after an [incident] has happened to see how it could have been avoided. But negligence is not a matter to be judged after the occurrence.") However, we do find that the first sentence in the jury charge on foreseeability is not a clear or completely accurate statement regarding the law of negligence. Nevertheless, this statement is only a

small portion of the trial court's overall instruction on negligence. "Reversible error ordinarily can not be predicated upon one paragraph, one sentence or one phrase of the general charge to the jury." *Synder v. Stanford* (1968), 15 Ohio St.2d 31, 238 N.E.2d 563, paragraph three of the syllabus. Where a trial court misstates the law or creates ambiguity in a portion of its jury instructions, it is not reversible error where the court's instructions, considered as a whole, are not prejudicial to the objecting party. Id. See, also, *State v. Porter* (1968), 14 Ohio St.2d 10, 235 N.E.2d 520; *Centrello v. Basky* (1955), 164 Ohio St. 41, 128 N.E.2d 80; *Ochsner v. Cincinnati Traction Co.* (1923), 107 Ohio St. 33, 140 N.E. 644; *Williams v. Oeder* (1995), 103 Ohio App.3d 333, 342, 659 N.E.2d 379. After reviewing the trial court's instructions on negligence as a whole, we do not believe that they were prejudicial.

{¶76} The Clements' third assignment of error is, therefore, overruled.

{¶77} Having found no error prejudicial to the appellants or cross-appellants herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**