OPINIONS OF THE SUPREME COURT OF OHIO

The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.

Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio. Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.

NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.

Berdyck, Appellee, v. Shinde, Appellee; H. B. Magruder Memorial
Hospital, Appellant.
[Cite as Berdyck v. Shinde (1993),    Ohio St.3d    .]
Malpractice -- Nurse under duty to keep attending physician
     informed of patient's condition -- Nurse must perform
     competent nursing assessment of patient in order to
     fulfill duty to inform attending physician -- Whether a
     nurse has satisfied or breached the duty of care owed
     patient determined, how -- Standard of care for licensed
     nurse practitioners -- Although particular act is within
     duty of care owed to patient by attending physician, such
     act is not excluded from nurse's duty, when -- Intervening
     negligence of attending physician does not absolve
     hospital of its prior negligence, when.
1.  Though a nurse is prohibited from engaging in the practice
     of medicine, a nurse employed by a hospital to which a
     patient is admitted by an attending physician is under a
     duty to keep the attending physician informed of the
     patient's condition so as to permit the physician to make
     a proper diagnosis and devise a plan of treatment for the
     patient.  (Albain v. Flower Hosp. [1990], 50 Ohio St.3d
     251, 553 N.E.2d 1038, followed.)
2.  In order to fulfill their duty to inform the attending
     physician, nurses must perform a competent nursing
     assessment of the patient to determine the signs and
     symptoms presented by the patient that are significant in
     relation to the attending physician's tasks of diagnosis
     and treatment.
3.  Because nurses are persons of superior knowledge and skill,
     nurses must employ that degree of care and skill that a
     nurse practitioner of ordinary care, skill and diligence
     should employ in like circumstances.  Whether a nurse has
     satisfied or breached the duty of care owed to the
     patient is determined by the applicable standard of
     conduct, which is proved by expert testimony.
4.  The standard of conduct for licensed nurse practitioners is
     that applicable to the community of persons engaged in
     that occupation.  Geographical considerations do not

control when identifying that community, but statutory standards for licensure are relevant to the standard of conduct required of licensed nurses in Ohio and may be used to prove that standard.

5. Though nurses are prohibited from practicing medicine, the fact that a particular act is within the duty of care owed to a patient by an attending physician does not necessarily exclude it from the duty of care owed to the patient by a nurse, and such act is not excluded from the nurse's duty if it is within the standard of conduct required to satisfy the nurse's separate duty of care.

6. The intervening negligence of an attending physician does not absolve a hospital of its prior negligence if both co-operated in proximately causing an injury to the patient and no break occurred in the chain of causation between the hospital's negligence and the resulting injury. In order to break the chain, the intervening negligence of the physician must be disconnected from the negligence of the hospital and must be of itself an efficient, independent, and self-producing cause of the patient's injury.

(No. 91-2558 -- Submitted February 10, 1993 -- Decided June 30, 1993.)

Appeal from the Court of Appeals for Ottawa County, No. 90-OT-060.

Appellee, Donna Berdyck, was pregnant with her third child in 1986. She was under the care of Dr. S.G. Shinde, a board-certified obstetrician on the staff of H.B. Magruder Memorial Hospital (the "hospital"), in Port Clinton.

Berdyck had a history of preeclampsia, a complication of pregnancy associated with weakening of the kidneys and spilled protein in the urine. Symptoms of preeclampsia include elevated blood pressure, increased reflexes, edema, headache, blurred vision, and pain in the epigastric, or upper abdominal, region. Severe preeclampsia can progress to eclampsia, which is signalled by the onset of seizures, or coma, in the mother. The risk of eclampsia can be avoided by administration of magnesium sulfate.

Dr. Shinde was aware of Berdyck's history and had classified her as at risk for preeclampsia. Dr. Shinde had observed a high blood pressure and a trace of protein in the urine during Berdyck's office visits. At an office visit on May 27, 1986, Berdyck complained of a fever and diarrhea, and told Dr. Shinde that she had experienced severe abdominal pains several days before. Dr. Shinde advised her to call him if the pains returned.

On May 28, 1986, Berdyck telephoned Dr. Shinde in the early evening hours and told him that her pains had returned. Dr. Shinde called a prescription to a pharmacy. Berdyck took the medication as directed. Her pain was not relieved, so in the early morning hours of May 29, 1986, Berdyck drove herself to the hospital for attention, arriving there at about 3:00 a.m.

When Berdyck arrived at the hospital she was met outside the emergency room by Nurse Evalda Holzapfel, who was then in overall charge of the hospital's nursing service. At that time Berdyck had passed an estimated thirty-eight weeks of her pregnancy. Berdyck told Nurse Holzapfel that she had not come

to deliver her baby but because something was wrong.

Nurse Holzapfel called Dr. Shinde and told him that Berdyck had presented with severe upper abdominal pain and asked if Dr. Shinde wanted her examined by the emergency room physician. Dr. Shinde said that would not be necessary, and told Nurse Holzapfel to have Berdyck admitted to the obstetrics department at the hospital.

Nurse Holzapfel put Berdyck in a wheelchair and took her to the obstetrics unit, where they were met by Nurse Lynne Pickett, who was on duty there that morning. Nurse Pickett asked Berdyck if she was there to deliver her baby. Again, Berdyck said that she was not, but that she was there because something else was wrong.

Berdyck was admitted to the obstetrics unit by Nurse Pickett at about 3:10 a.m. Berdyck told Nurse Pickett that she had severe upper abdominal pain and was experiencing nausea and headache. Nurse Pickett asked if Berdyck could pass urine. Berdyck said that she could not. Nurse Pickett took a blood pressure reading at approximately 3:20 a.m., and found it to be elevated. Nurse Pickett did not immediately relay this information to Dr. Shinde.

At about 3:40 a.m., Nurse Pickett again took a blood pressure reading and found it to be elevated. Nurse Pickett then called Dr. Shinde at 4:00 a.m. There is a conflict in their testimony concerning what Nurse Pickett reported. Nurse Pickett states that Dr. Shinde was given a comparison of two blood pressure readings. Dr. Shinde recalls being told of but one reading, which was elevated. Both testified that Nurse Pickett told Dr. Shinde that the patient was unable to void. Nurse Pickett could not recall reporting the patient's abdominal pain or headache. Dr. Shinde recalled being told of abdominal pain, though it was not termed "epigastric," and had no recollection of being told of a headache.

Dr. Shinde asked for the results of blood tests that had been performed and was given those results by Nurse Pickett. Dr. Shinde did not specifically mention preeclampsia or ask any questions about its possibility. Based on the information from Nurse Pickett, Dr. Shinde concluded that Berdyck had a gastric disturbance from flu and dehydration. Dr. Shinde ordered Nurse Pickett to keep the patient quiet and to observe her blood pressure closely.

Nurse Pickett took another blood pressure reading about five minutes after the conversation with Dr. Shinde, finding it to be 192/112. Nurse Pickett did not report the finding to Dr. Shinde. Nurse Pickett took no further blood pressure readings and did not report again to Dr. Shinde. Nurse Holzapfel later returned to the obstetrics unit and told Nurse Pickett to watch Berdyck's blood pressure and to feel free to call Dr. Shinde.

At 5:15 a.m., Nurse Pickett heard noises from Berdyck's room and entered, finding Berdyck in a grand mal seizure. Dr. Shinde was called and came to the hospital immediately. Dr. Shinde treated Berdyck's eclamptic seizure by administering magnesium sulfate. Dr. Shinde arranged for the delivery of Berdyck's child. A healthy baby boy was delivered surgically.

Berdyck suffered a paralysis of her left side as a result of her eclamptic seizure. She was transferred to a hospital in Toledo, where she remained for three months. Though some of

her neurological and muscular faculties have returned, Berdyck has not made a complete recovery.

Berdyck filed her complaint against Dr. Shinde and the hospital, alleging breaches of their duties of care. The matter was referred for arbitration, and extensive evidence was presented concerning the standard of care required of Dr. Shinde and of the hospital and its registered nurses.

It was generally agreed that Berdyck's eclamptic seizure could have been prevented had magnesium sulfate, the treatment of choice, been administered to Berdyck at or shortly after 4:00 a.m. Dr. Shinde stated that, in hindsight, he should have gone to the hospital on receiving Nurse Pickett's report of an elevated blood pressure then, but at the time he did not believe it was necessary. His attorney stipulated that Dr. Shinde had deviated from the standard of care required of him when he did not then go to the hospital and that Dr. Shinde's failure was a proximate cause of Berdyck's seizure, but not the sole proximate cause.

Expert witnesses in the fields of medicine and nursing testified that the hospital nurses deviated from the required standard of care in failing to recognize the signs and symptoms of preeclampsia presented by Berdyck, in failing to keep her under close observation, and in failing to make the appropriate report of the patient's preeclamptic symptoms to her physician. Dr. Shinde testified that had other symptoms of preeclampsia been reported along with the elevated blood pressure he would likely have been alerted to it. Dr. Shinde also testified that his instruction to observe the blood pressure closely implied that the nurses should call him again if elevated readings were repeated, which was not done.

The arbitration panel awarded judgment to Berdyck for $1,250,000, assigning eighty percent of the liability to Dr. Shinde and twenty percent to the hospital. The award was rejected by Berdyck and by Dr. Shinde and brought before the trial court.

A motion for summary judgment was filed by the hospital. The trial court granted the hospital's motion, ordering the hospital dismissed from the case. The court stated that it accepted the testimony of Nurse Pickett. The trial court held that the plaintiff's claim for relief would require nurses to engage in the practice of medicine when their only duty to the patient is to inform the attending physician of the patient's condition and to follow the physician's orders relating to the patient's care. The trial court certified its order dismissing the hospital, pursuant to Civ.R. 54(B).

The court of appeals reversed the summary judgment dismissing the hospital, holding that there was conflicting evidence concerning whether the nurses and the hospital had breached their duties of care, which is to be determined from the standard of care applicable to nurses in the community.

The cause is now before this court pursuant to the allowance of a motion to certify the record.


Jack M. Lenavitt, L.P.A., and Mark L. Schumacher, for appellee Donna Berdyck.

Jacobson, Maynard, Tuschman & Kalur, James M. Tuschman, Nancy D. Moody and Janis L. Small, for appellee S.G. Shinde,

M.D.

Manahan, Pietrykowski, Bamman & DeLaney, William F. Pietrykowski and H. William Bamman; Robison, Curphey & O'Connell and E. Thomas Maguire, for appellant H.B. Magruder Memorial Hospital.

Cloppert, Portman, Sauter, Latanick & Foley, Russell E. Carnahan and David G. Latanick, for amicus curiae, Ohio Nurses Association.

Grady, J.    This case presents two issues for determination.  First, what is the duty of care owed by a nurse to a patient who is admitted under the care of an attending physician to a hospital at which the nurse is employed? Second, does negligence on the part of the attending physician necessarily relieve the hospital of liability for a breach of the nurse's duty of care?

Our review in this case is governed by the standard for granting a motion for summary judgment:

"Civ.R. 56(C) specifically provides that before summary judgment may be granted, it must be determined that:  (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party."  Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274; Van Fossen v. Babcock & Wilcox Co. (1988), 36 Ohio St.3d 100, 117, 522 N.E.2d 489, 505.

Under the doctrine of respondeat superior, a hospital is liable for the negligent acts of its employees.  Klema v. St. Elizabeth's Hosp. of Youngstown (1960), 170 Ohio St. 519, 11 O.O.2d 326, 166 N.E.2d 765.  To establish the negligence of a hospital employee, an injured party must demonstrate that a duty of care was owed to the injured party by the employee, that the employee breached that duty, and that the injuries concerned were the proximate result of the breach.

A "duty" is an obligation imposed by law on one person to act for the benefit of another person due to the relationship between them.  When risks and dangers inherent in the relationship or incident to it may be avoided by the obligor's exercise of care, an obligor who fails to do so will be liable to the other person for injuries proximately resulting from those risks and dangers if the injuries were reasonably foreseeable.  In negligence cases the duty is always the same: to conform to the legal standard of reasonable conduct in the light of apparent risk.  What a defendant must do, or must not do, is a question of the standard of conduct reasonably required to satisfy the defendant's duty.  See Prosser & Keeton on Torts (5 Ed. 1984) 356, Section 53.

In general, a standard of "reasonable" conduct implies a minimum standard of care.  But, if a condition by its nature requires the application of knowledge and skill superior to that of the ordinary person, one who possesses that superior knowledge and skill and who fails to employ it for the benefit of another when their relation requires it will be held liable

for injuries proximately resulting from that failure. Such persons must use the care and skill reasonable in the light of their superior learning and experience, not simply a minimum standard of care. For those persons the relevant standard of conduct is "good practice." See id. at 185, 189, Section 32.

The most frequently applied example of persons of superior knowledge and skill who are held to a standard of good practice is that of physicians. The practice of medicine, which includes the diagnosis of an adverse health condition and the prescription of a course of treatment for its management and care, is limited by law to licensed physicians. See R.C. 4731.34. In order to obtain licensure, physicians must demonstrate a level of education and proficiency required by law. See R.C. 4731.09, 4731.091; 4731.11 et seq.

The law imposes on physicians engaged in the practice of medicine a duty to employ that degree of skill, care and diligence that a physician or surgeon of the same medical speciality would employ in like circumstances. Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, 130, 75 O.O. 2d 184, 186, 346 N.E.2d 673, 676. A negligent failure to discharge that duty constitutes "medical malpractice" if it proximately results in an injury to the patient. Whether negligence exists is determined by the relevant standard of conduct for the physician. That standard is proved through expert testimony. Id. at 131-132, 75 O.O.2d at 186-187, 346 N.E.2d at 677. Neither the expert nor the standard is limited by geographical considerations. Id. at 134-135, 75 O.O.2d at 188, 346 N.E.2d at 679.

Nurses are, and have been since 1915, also subject to licensure by the state. (106 Ohio Laws 191.) Like physicians, professional nurses must demonstrate a level of education and proficiency required by law in order to be licensed. At the time Berdyck was a patient at H.B. Magruder Memorial Hospital in 1986, the practice of professional nursing was defined in R.C. 4723.06:

"'Practice of professional nursing' means the performance for compensation of acts requiring substantial judgment and specialized skills based on knowledge and application of scientific principles learned in an approved school of professional nursing. Acts of medical diagnosis or prescription of medical, therapeutic, or corrective medical measures by a nurse are prohibited."

The definition of nursing practice was amended in 1988, and is now set forth in more detail in R.C. 4723.02(B).1 While the current definitional statute does not include a prohibition against medical practice, R.C. 4723.151 now provides: "Medical diagnosis, prescription of medical measures, and the practice of medicine or surgery or any of its branches by a nurse are prohibited." See, also, Richardson v. Doe (1964), 176 Ohio St. 370, 27 O.O.2d 345, 199 N.E.2d 878.

Because they are prohibited from practicing medicine, hospitals and nurses cannot pass on the efficacy of a course of treatment. See Albain v. Flower Hosp. (1990), 50 Ohio St.3d 251, 259, 553 N.E.2d 1038, 1046. They are, nevertheless, required to assist the physician to do so when the hospital admits the patient for that purpose at the physician's order or request and places the patient in the care of its nursing

staff.  Then, "* * * accepted standards of nursing practice include the duty to keep the attending physician informed of a patient's condition so as to permit the physician to make a proper diagnosis and devise a plan of treatment for the patient."  Id., 50 Ohio St.3d at 265, 553 N.E.2d at 1051.

In order to fulfill the foregoing duty, nurses must perform a competent nursing assessment of the patient to determine those signs and symptoms presented by the patient that are significant in relation to the attending physician's tasks of diagnosis and treatment.  Because nurses are persons of superior knowledge and skill, they must employ that degree of care and skill that a nurse practitioner of ordinary care, skill and diligence should employ in like circumstances.  Whether a nurse has satisfied or breached the duties of care owed to the patient is determined by the applicable standard of conduct.

The standard of conduct applicable to this issue is proved by expert testimony.  "In a negligence action involving the professional skill and judgment of a nurse, expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and, that the nurse's negligence, if any, was the proximate cause of the patient's injury."  Ramage v. Cent. Ohio Emergency Serv., Inc. (1992), 64 Ohio St.3d 97, 592 N.E.2d 828, paragraph one of the syllabus.  In a negligence action involving conduct within the common knowledge and experience of jurors, expert testimony is not required.  Id. at 103, 592 N.E. 2d at 833.  Examples of the latter are allegations of negligence with regard to patients who fell from their hospital beds while unattended.  See Jones v. Hawkes Hosp. of Mt. Carmel (1964), 175 Ohio St. 503, 26 O.O.2d 170, 196 N.E.2d 592; Burks v. Christ Hosp. (1969), 19 Ohio St.2d 128, 48 O.O.2d 117, 249 N.E.2d 829.  In this case, as the negligence action brought by Berdyck involves the professional skill and judgment of nurses employed by the hospital, expert testimony is required to prove the relevant standard of conduct.

The hospital admitted that accepted standards of nursing practice require its obstetrical staff nurses to be able to recognize major obstetrical complications, including preeclampsia.  Nurse Holzapfel admitted a lack of knowledge of the symptoms of preeclampsia when Berdyck was admitted.  Dr. Harlan Giles, an expert witness for Berdyck, opined essentially that standard nursing care requires that an obstetrical nurse be aware of the signs and symptoms of preeclampsia and that Nurse Pickett lacked an appropriate basic level of nursing information about that condition and its symptoms.

Patricia Sexton-Zgrabik, R.N., an obstetrical nurse called as an expert witness for Berdyck, stated that a nurse presented with Berdyck's pregnant condition and symptoms should be concerned about the possibility of a seizure and should watch the patient very closely.  The nurse should assess the patient's reflexes and monitor the blood pressure continuously.  The nurse should also institute measures to protect against seizure, including having an oral airway or tongueblade available, padding the bed side rails, darkening the room, and positioning the patient on her left side to aid the reduction of blood pressure.  The nurse should also have magnesium sulfate readily available.  The witness testified

that Nurse Pickett's failure to perform these procedures was conduct below that required by the applicable standard of care, and that the hospital was negligent in not providing personnel trained in the measures necessary.

Dr. William Rayburn, an expert witness for the hospital, opined that the acts of the hospital's nurses did not directly cause Berdyck's seizure, but he conceded that in their care of Berdyck the nurses at the hospital failed to comply with the standard of care required by that hospital's rules and regulations for nursing service. Dr. Rayburn stated that a reasonably prudent and careful nurse would have reported the symptoms of headache, persistent vomiting, epigastric pain, decreased urine output, edema, and high blood pressure to the attending physician. He also conceded that Nurse Pickett did not possess the minimum knowledge of obstetrics reasonably required of a nurse placed in charge of a hospital obstetrics unit.

Dr. Christopher Marlowe, an expert witness for Dr. Shinde, testified that Nurse Pickett did not give Dr. Shinde "anywhere near enough information to form an opinion as to what was going with his patient."

The foregoing testimony, if believed, demonstrates that the hospital's nurses failed to perform their duties according to the applicable standard of conduct. Failure to conform to that standard of conduct is evidence that the nurses, and the hospital employing them, breached the duty they owed their patient to exercise that degree of care and skill that the condition of the patient reasonably required.

Appellant hospital argues that the court of appeals erred when it held that the standard of conduct required of a nurse is that applicable to nurses in the community. We do not understand the court to have imposed a locality rule in its use of the term "community." Rather, the court was concerned with the community of persons engaged in the practice of professional nursing. As with physicians, geographical considerations or circumstances do not control when identifying that community. See Bruni v. Tatsumi, supra. However, the statutory standards for licensure are relevant to the standard of conduct required of licensed nurses in Ohio, and may be used to prove that standard.

Appellant hospital also argues that the court of appeals misconstrued the rule of Albain v. Flower Hosp., supra, when it held that nurses are held to a greater accountability than informing physicians and following their orders. We see no error in the view of the court of appeals. Albain held that the hospital and its employees have a duty to follow the orders of an attending physician, of which the duty to keep the physicians informed is an integral part, but that merely following the orders of a physician is not the full extent of the duty of care owed to a patient by a nurse. Id. at 264-265, 533 N.E.2d at 1050-1051. In order to satisfy that duty to its full extent, a nurse must perform a competent nursing assessment of the patient's condition according to the standards of conduct required of a nurse practitioner. The evidence, if believed, reasonably permits a conclusion that the nurses here failed in that duty.

Appellee Berdyck also argues that the hospital is liable

for the failure of its nurses to seek definitive care to prevent the injuries she suffered. Appellee is joined in this view by amicus Ohio Nurses Association, which urges adoption of a rule requiring licensed nurses to advocate on behalf of their patients when they do not receive the care their condition requires so as to obtain that care for them.

Both physicians and nurse practitioners are persons who have undertaken work calling for special skill. Both are required not only to exercise reasonable care in what they do, but also to possess a standard minimum of special knowledge and ability for persons in their callings. However, their respective duties to the patient differ because their respective relationships with the patient are different. Correspondingly, the standard of conduct required of each -- what each must do or not do to satisfy his or her duties -- will differ.

The law imposes on the physician the exclusive duty to diagnose the patient's adverse health condition and to prescribe a course of treatment for its management and care. Nurse practitioners employed by a hospital to which the patient is admitted by an attending physician are under a duty to support that process. The standard of conduct required of a nurse cannot include the process of medical diagnosis and treatment, which is reserved to the physician. Nevertheless, the fact that a particular act is within a physician's duty of care does not necessarily exclude it from the duty of care owed to the patient by the nurse. Depending on the facts and circumstances, the same act may be within the scope of their separate duties of care because it is, coincidentally, within their respective standards of conduct. Whether it is or is not is a question of fact to be determined by the standard of conduct required, which is proved by expert testimony.

A nurse who concludes that an attending physician has misdiagnosed a condition or has not prescribed the appropriate course of treatment may not modify the course set by the physician simply because the nurse holds a different view. To permit that conduct would allow the nurse to perform tasks of diagnosis and treatment denied to the nurse by law. Richardson v. Doe, supra. However, the nurse is not prohibited from calling on or consulting with nurse supervisors or with other physicians on the hospital staff concerning those matters, and when the patient's condition reasonably requires it the nurse has a duty to do those tasks when they are within the ordinary care and skill required by the relevant standard of conduct. Of course, hospitals, and the nurses they employ, owe a duty to every patient whom they admit to save the patient from an illegal operation or false, fraudulent, or fictitious medical treatment. Albain v. Flower Hosp., supra, at 259, 553 N.E.2d at 1046. That is not an issue here, however.

Appellee Berdyck's expert witness Patricia Sexton-Zgrabik testified that a nurse trained to recognize preeclampsia and seeing the symptoms presented by Berdyck would, in the event of the failure of the attending physician to deal with them, seek the timely intervention of another physician. She also testified that a reasonably prudent nurse who observed these repeated high blood pressures would take action to override the physician's orders and invoke the necessary treatment protocol.

Whether the standard of conduct articulated by this expert witness governs the nurses' duties of care is a question of fact, determined from all relevant facts and circumstances. The trier must determine whether the course the witness recommends is reserved to the practice of medicine and, therefore, outside the duties of a nurse. However, as the same witness testified that the nurses in this case negligently failed to recognize the symptoms of preeclampsia, it is hypothetical, at best, to require them to act to prevent that which they did not know. Of course, their failure to recognize the condition may in itself produce liability if it is shown to be a proximate cause of the injury.

Viewing the evidence as Civ.R. 56(C) requires, we conclude that a genuine issue of material fact exists concerning whether the nurses employed by the hospital were required by the duty of care they owed Berdyck to inform Dr. Shinde of Berdyck's condition otherwise than as they did and/or to respond to and follow the orders they were given by Dr. Shinde other than as they did.

Appellant hospital also argues that Dr. Shinde's admission of negligence makes the hospital's negligence, if any, remote to the injuries sustained by Berdyck, not actionable, and relieves the hospital of any liability.

Dr. Shinde stipulated that he was negligent in not going to the hospital when he received a call from Nurse Pickett at 4:00 a.m., and that his negligence was a proximate cause, though not the sole proximate cause, of Berdyck's injuries. Dr. Shinde also stated that had Nurse Pickett given him a fuller report of Berdyck's symptoms he would more likely have been alerted to suspect preeclampsia.

The intervention of a responsible human agency between a wrongful act and an injury does not absolve a defendant from liability if that defendant's prior negligence and the negligence of the intervening agency co-operated in proximately causing the injury. If the original negligence continues to the time of the injury and contributes substantially thereto in conjunction with the intervening act, each may be a proximate, concurring cause for which full liability may be imposed. "Concurrent negligence consists of the negligence of two or more persons concurring, not necessarily in point of time, but in point of consequence, in producing a single indivisible injury." Garbe v. Halloran (1948), 150 Ohio St. 476, 38 O.O. 325, 83 N.E.2d 217, paragraph one of the syllabus.

In order to relieve a party of liability, a break in the chain of causation must take place. A break will occur when there intervenes between an agency creating a hazard and an injury resulting therefrom another conscious and responsible agency which could or should have eliminated the hazard. Hurt v. Charles J. Rogers Transp. Co. (1955), 164 Ohio St. 323, 58 O.O. 119, 130 N.E.2d 824, paragraph one of the syllabus; Thrash v. U-Drive It Co. (1953), 158 Ohio St. 465, 49 O.O. 402, 110 N.E.2d 419, paragraph two of the syllabus. However, the intervening cause must be disconnected from the negligence of the first person and must be of itself an efficient, independent, and self-producing cause of the injury.

Thus, we hold that the intervening negligence of an attending physician does not absolve a hospital of its prior

negligence if both co-operated in proximately causing an injury to the patient and no break occurred in the chain of causation between the hospital's negligence and the resulting injury. In order to break the chain, the intervening negligence of the physician must be disconnected from the negligence of the hospital and must be of itself an efficient, independent, and self-producing cause of the patient's injury.

The evidence, construed most strongly against defendant-appellant hospital as required by Civ.R. 56(C), reasonably permits a conclusion that the negligence admitted by Dr. Shinde and the possible negligence of the hospital may be concurring proximate causes of Berdyck's injuries. Therefore, the hospital is not entitled to summary judgment on the issue.

The judgment of the court of appeals is affirmed.

Judgment affirmed.

Moyer, C.J., A.W. Sweeney, Douglas, Wright and Pfeifer, JJ., concur.

F.E. Sweeney, J., concurs in judgment only.

Thomas J. Grady, J., of the Second Appellate District, sitting for Resnick, J.

FOOTNOTE:

1  R.C. 4723.02(B) provides:

"'Practice of nursing as a registered nurse' means providing to individuals and groups nursing care requiring specialized knowledge, judgment, and skill derived from the principles of biological, physical, behavioral, social, and nursing sciences. Such nursing care includes:

"(1) Identifying patters of human responses to actual or potential health problems amenable to a nursing regimen;

"(2) Executing a nursing regimen through the selection, performance, management, and evaluation of nursing actions;

"(3) Assessing health status for the purpose of providing nursing care;

"(4) Providing health counseling and health teaching;

"(5) Administering medications, treatments, and executing regimens prescribed by licensed physicians, dentists, and podiatrists;

"(6) Teaching, administering, supervising, delegating, and evaluating nursing practice."