[Cite as *Turner v. Elk & Elk, L.P.A.*, 2011-Ohio-5499.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 96271**

**VINCENT TURNER, ADMINISTRATOR OF THE ESTATE OF GARDENIA TURNER, DECEASED**

PLAINTIFF-APPELLANT

vs.

## ELK & ELK L.P.A., ET AL.

DEFENDANTS-APPELLEES

**JUDGMENT:
AFFIRMED**

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-695681

**BEFORE:**  Kilbane, A.J., Blackmon, J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:**  October 27, 2011

**ATTORNEYS FOR APPELLANT**

Jack Morrison, Jr.
Vicki L. Desantis
Thomas R. Houlihan
Amer Cunningham Co., L.P.A.
159 South Main Street
Key Building - Suite 1100
Akron, Ohio 44308

**ATTORNEY FOR APPELLEES**

John P. O'Neil
Reminger Co., L.P.A.
1400 Midland Building
101 Prospect Avenue, West
Cleveland, Ohio 44115-1093

MARY EILEEN KILBANE, A.J.:

{¶ 1} Plaintiff-appellant, Vincent Turner (Turner), son of Gardenia Turner (Gardenia) and Administrator of her estate, appeals from the defense verdict rendered in his legal malpractice action against defendants Elk & Elk, L.P.A. and Martin Delahunty III. For the reasons set forth below, we affirm.

{¶ 2} On November 15, 2001, Dr. James Hessler performed a tubinate surgery with a tonsillectomy and palatoplasty on 60-year-old Gardenia at Wooster Community Hospital (Wooster Hospital). Gardenia suffered from obstructive sleep apnea. Following surgery,

and after her breathing tube was removed, she experienced difficulty breathing. She was reintubated, given a tracheostomy, placed on a ventilator, and given Demerol for pain at two-hour intervals. By around 8:30 a.m. the following morning, she was taken off the ventilator. Two hours later, she was put back on the ventilator. After about an hour, nurses maintaining the tracheostomy tube could not pass a suction catheter into her lungs. Responding to a stat call to the room, anesthesiologist Benjamin Weeman, Doctor Robert Sibilia, and Doctor Hessler administered an Ambu bag and attempted to re-establish ventilation through the tracheostomy, a breathing tube, and jet ventilation through a bore needle in Gardenia's neck, but she went into cardiac arrest and died.

{¶ 3} On February 17, 2003, plaintiff entered into a contingency fee agreement with defendant Delahunty of Elk & Elk. Delahunty filed suit against Doctor Hessler and Wooster Hospital on May 2, 2003. He voluntarily dismissed the lawsuit on June 2, 2004, and refiled it on May 26, 2006. By mid-2006, Delahunty concluded that Gardenia had died from an overdose of Demerol, but he was unable to retain an expert who met the requirements for testifying in court as to liability.[1] The trial court awarded Doctor

---

[1] Under Evid.R. 601(D), an individual is not competent to give "expert testimony on the issue of liability in any claim asserted in any civil action against a physician, * * * or hospital arising out of the diagnosis, care, or treatment of any person * * *, unless the person testifying is licensed to practice * * * by the state medical board or by the licensing authority of any state, and unless the person devotes at least one-half of his or her professional time to the active clinical practice in his or her field of licensure, or to its instruction in an accredited school." See, also, R.C. 2743.43(A) (requiring, inter alia, that three-fourths of the person's professional time to the active clinical practice and that the person practices in the same or a substantially similar specialty as the defendant).

As set forth in *Wise v. Doctors Hosp. North* (1982), 7 Ohio App.3d 331, 455

Hessler and Wooster Hospital summary judgment. Attorney Peter Traska of Elk & Elk perfected an appeal to the Ninth District Court of Appeals, but the appeal was dismissed for failure to timely file the appellant's brief.

{¶ 4} Plaintiff filed suit against Elk & Elk, Arthur Elk, David Elk, Delahunty, and Traska on June 12, 2009. Plaintiff alleged that the defendants breached their duty of care in the matter by failing to sue the proper parties, failing to consult medical experts to assess the merits of the malpractice action, failing to identify medical experts to support the malpractice action, and failing to properly appeal the entry of summary judgment.

{¶ 5} Arthur Elk and David Elk were subsequently granted summary judgment, and plaintiff voluntarily dismissed his claims against Traska. The matter proceeded to a jury trial on November 15, 2010.

{¶ 6} Turner testified that his family moved to Wooster, Ohio from West Virginia, and that the family was extremely close-knit. At the time of her death, his mother was 60 years old and had six children and 18 grandchildren. She worked full time in the stockroom at Gertenslager's Stamping Plant and earned between $28,000 and $30,000 per year. Prior to the 2001 surgery, his mother had sleep apnea and snored, but had been in good health and had no lung problems. In the evening after her surgery, Gardenia had an endotracheal tube and was in discomfort but was doing well. The next morning, his

N.E.2d 1032, the "liability issues are duty and breach of duty, liability being defined as responsibility for conduct. The damage issues are proximate cause and damages."

sister, Felicia Jean Hart (Felicia), called and told him to come to the hospital. When Turner arrived minutes later, the doctors were working on his mother and they ushered him from the room. Doctors Hessler and Sibilia later spoke to him briefly and explained that they were trying to insert tubes into Gardenia's lungs. A short time later, Doctor Hessler returned and said that Gardenia had died. According to Turner, it appeared as though his mother had "swollen up."

{¶ 7} In 2003, he contacted Elk & Elk to pursue a medical malpractice action on behalf of his mother's estate. An investigator from the firm met with Turner, and subsequently Delahunty's paralegal, Melanie Alvado (Alvado), called them and indicated that the firm would take the case. Turner and Delahunty signed a contingency fee agreement, but whenever Turner called the firm, Alvado rather than Delahunty would speak with him. He did not meet Delahunty until 2007.

{¶ 8} Turner further testified that Delahunty at no time explained to him that he was having difficulty obtaining an expert to testify as to a breach of the standard of care, did not inform him that he had dismissed then refiled the case, and did not inform him that the appellate brief had not been timely filed.

{¶ 9} On cross-examination, Turner admitted that the death certificate issued in this matter states that Gardenia died from "acute respiratory insufficiency, massive generalized edema, acute anaphylactic reaction, possibly secondary to Demerol injection."

{¶ 10} Delahunty testified on cross-examination that he had ultimate responsibility over the matter. Delahunty stated that physicians retained as independent contractors by

Elk & Elk, Doctor Stearns and Doctor Herman, did not believe that there was any viable cause of action, but he wanted to give the family a chance. He stated that physicians from American Medical Forensic Specialists (AMFS) reviewed the case and determined that Gardenia did not die due to a lost airway. Doctor Herman also opined that it was not a lost airway case. Some of the medical records, including the coroner's report, indicated that Turner had a meperidine, i.e., Demerol, level of five times the limit. Delahunty, in reliance upon toxicologist Olen Brown, Ph.D., believed there was a good faith basis to conclude that Gardenia had died from a Demerol overdose.

{¶ 11} Delahunty admitted that a paralegal erroneously inserted Gardenia's name on a request for medical records in a dog bite case. Another request for medical records was directed to a physician who never treated her, and a third contained a date of injury that was over a year after her death. Also, the complaint at one point, referenced "Elaine Walden," rather than Gardenia, and a punitive damages claim was dismissed for failing to state a viable claim against a municipal hospital.

{¶ 12} Delahunty explained that he dismissed the complaint after learning that Doctor Brown could not testify for the plaintiff. After refiling the matter, Delahunty sought out numerous experts on the issue of the standard of care in this matter, but he could not find one. He subsequently retained Doctor Barry Gustin, who did not meet the requirements for testifying as to liability, but in regard to the issue of proximate cause, he believed that Gardenia suffered a fatal drug overdose. According to Delahunty, Doctor Gustin was the only physician he could find who was willing to testify for the plaintiff.

Moreover, Delahunty believed that the excessive amount of meperidine permitted the inference of negligence under res ipsa loquitur.[2]   However, the trial court ruled on July 23, 2007, that the doctrine of res ipsa loquitur could not be used under the facts of the Turner medical malpractice case, and it entered summary judgment in favor of the defendants.

{¶ 13} The firm commenced an appeal and Delahunty spoke with Traska, an appellate attorney for Elk & Elk, about the issues to be raised.   In January 2008, however, Delahunty began an extensive medical leave.   A paralegal did not properly docket the appeal and did not notify Traska of the deadline for the appellant's brief, and therefore, the appeal was subsequently dismissed.   The Ohio Supreme Court did not permit a further appeal, and he admitted that the opportunity to have a reviewing court examine the trial court's ruling was lost.

---

[2]Under the evidentiary rule of res ipsa loquitur, a jury is permitted to draw an inference of negligence from circumstantial evidence. *Estate of Hall v. Akron Gen. Med. Ctr.*, 125 Ohio St.3d 300, 2010-Ohio-1041, 927 N.E.2d 1112 (explaining that the rule had traditionally been permitted "in the cases where expert medical testimony was not necessary because the negligence was so obvious that jurors could determine from their own knowledge and common sense that the physician had been negligent — for example, when a physician failed to remove a sponge or other foreign object from the patient's body during surgery.") Under *Hall*, the court held that a court must determine on a case-by-case basis whether the doctrine of res ipsa loquitur applies, but the instruction is not warranted in a medical malpractice action where medical experts present opposing opinions regarding cause of an injury, and one that was not attributable to negligence, and the injury is a known risk and complication of the procedure even when performed in compliance with standard of care.

{¶ 14} Traska admitted on cross-examination that he was aware that dismissal is a possible sanction for failure to timely file an appellate brief, but this severe sanction is unusual. He stated, however, that he believed that the outcome of the case would have been the same if the court had heard the appeal on its merits.

{¶ 15} Doctor John Kress, a pulmonary critical care physician who is board certified in internal medicine, anesthesiology, pulmonary medicine, and critical care, opined to a reasonable degree of medical certainty that the circumstances of Gardenia's death were inconsistent with a Demerol overdose in that the amount that she had been given was within the typical range and the high post- mortem amounts were due to the fact that the final injection did not get distributed throughout her body prior to her death. He additionally opined that the findings were not consistent with anaphylaxis, which would cause a rash and hives, and close the airway at the larynx but not at the trachea. Further, this type of reaction would be unlikely here, upon Gardenia's seventh dose of Demerol.

{¶ 16} According to Doctor Kress, the medical records indicate that Gardenia had lost her airway, since a nurse reported noises indicative of a leak in the area of the tube and because a suction catheter could not be inserted into the tube. In addition, Gardenia complained of being short of breath, and resistence was noted by Doctor Weeman when he attempted to ventilate Gardenia using an Ambu bag. In Doctor Kress's opinion, the endotracheal tube came out and became embedded in the surrounding tissue. The resulting attempts to administer air resulted in air being sent into the tissue, giving the patient a swollen appearance.

{¶ 17} Although the medical malpractice defendants attempted to insert a 5.0 size endotracheal tube through the 6.0 tube that had already been inserted, this only exacerbated the problem. When they tried to re-establish the airway by inserting another breathing tube, they were too late because Gardenia's neck had already become swollen. Jet ventilation was also administered too late. Doctor Kress stated that, although it is not substandard to fail to insert an endotracheal tube, the medical malpractice defendants had violated the standard of care by failing to promptly recognize that the crisis and the resulting delays caused Gardenia's death. Although the autopsy states that "an Endotracheal tube is in place through a tracheostomy," this is simply in reference to the external examination, and there is no mention of the precise positioning of the tube upon the internal examination.

{¶ 18} On cross-examination, Doctor Kress acknowledged that trachea care had been provided without incident, but the doctor's notes indicate that the ventilator alarm sounded two minutes after Gardenia received her seventh dose of Demerol. He also noted that if during ventilation attempts, air had come out of Gardenia's nose, this could indicate that the trachea was in its proper position. He also admitted that the coroner found "massive generalized edema," and "acute anaphylactic reaction, possibly due to Demerol[,]" and also concluded that the subcutaneous air found in her system developed later. He acknowledged that Demerol can cause an anaphylactic reaction.

{¶ 19} David Elk testified that Delahunty and Traska are employed by the firm. He stated that by entering into the contingency fee agreement, the firm agreed to

investigate the matter, determine if it was worthy of recovery, and incur all of the expenses involved with the case. He admitted that if an attorney violates the standard of care, then that constitutes neglect, and that the firm was responsible for the paralegal's mistake in failing to docket the appeal, which resulted in the firm failing to file the brief.

{¶ 20} David Elk further testified that Delahunty had gone "above and beyond" in trying to get a medical expert to establish a breach in the standard of care owed to Gardenia, as he contacted an expert referral service, which in turn contacted a critical care expert, a forensic pathologist, and a toxicologist. The firm then paid for each of those individuals to review the medical records, but all subsequently opined that there had been no breach. Delahunty then attempted to establish liability through res ipsa loquitur, but this argument was rejected by the trial court. At that point, the firm had expended over $13,000.

{¶ 21} Former Judge Robert Glickman testified as an expert for plaintiff. Glickman stated that Elk & Elk failed to meet the standard of care in Turner's medical malpractice action by failing to include the nurses and Doctors Sibilia and Weeman as defendants in the case, failing to depose the defendants or the defendant's medical experts in the medical case, failing to obtain an expert to establish a breach of the standard of care, attempting to establish negligence via res ipsa loquitur, failing to timely file the appellant's brief, and failing to have an organized and coordinated approach to safeguard against errors. According to Glickman, the failure to file the appellant's brief deprived the Turner family of their right to appeal the trial court's decision.

{¶ 22} Felicia, one of Gardenia's six children, testified that the doctors informed her that "the muscles of her mother's throat had collapsed," and she had been intubated. As Felicia sat with her mother, the ventilator alarm sounded and her mother made gurgling sounds. The nurse suctioned the airway, but the ventilator alarm continued to sound, and Gardenia's blood pressure dropped. She died a short time later.

{¶ 23} At the close of the plaintiff's case, the trial court denied a defense motion for a directed verdict. Defendants then presented testimony from Delahunty, Doctor Hessler, Doctor Weeman, Doctor Frederick Bunge, and attorney Paul Perantinides.

{¶ 24} Delahunty stated that he has been an attorney since 1987. He has handled over 300 medical malpractice cases, including 50 from Wayne County, and about 20 that proceeded to trial. At Elk & Elk, attorneys and staff keep computerized Needles notes regarding the progress of their cases. Referencing the Needles notes, he explained that when the firm received the case in February 2003, the one-year statute of limitations had already expired on the survivorship claims, and the two-year statute of limitations was approaching on the remaining claims. Turner's previous attorneys at the law firm of Scanlon & Gearinger, had sent out a 180-day letter to extend this period only as to Doctor Hessler and Wooster Hospital.

{¶ 25} Delahunty next obtained a complete set of Gardenia's medical records from Jonathan Mester from Nurenberg, Paris, Heller & McCarthy, which had also briefly represented Gardenia's Estate. The packet of material from Mester also included a letter from Mester's expert, Dr. Penek, who opined that the standard of care was not breached.

Then in May 2003, Delahunty filed suit on the theory that the coroner's toxicology analysis demonstrated that Gardenia had five times the accepted level of Demerol in her system. He attempted to retain an expert through AMFS, an expert locating service that he had used in the past. At AMFS, the file was subjected to an interdisciplinary review process that highlighted a potential theory of a Demerol overdose and referred Delahunty to Dr. Olen Brown, Ph.D.

{¶ 26} Independently of AMFS, Delahunty sought review of the case from the perspectives of critical care, forensic pathology, pulmonology, and anesthesiology. He did not obtain an expert to establish liability under these disciplines, however, and he dismissed the case. At that point, Delahunty explained to Turner that the dismissal was a strategy to avoid a dismissal with prejudice for failing to identify an expert within the court's deadline. He did not depose the defense experts because he had no focus for questioning on liability.

{¶ 27} Later, Delahunty refiled the matter in 2005. By that time, he was dissatisfied with Doctor Brown, and he contacted Doctor Gustin, President of the AMFS, who indicated that Gardenia's symptomology was consistent with a Demerol overdose. Because Dr. Gustin spent only about 10 percent of his time treating emergency room patients, he could not testify as to liability but could testify as to causation and damages. In light of this information, Delahunty determined that he could proceed on the basis of res ipsa loquitur, but continue to search for a doctor.

{¶ 28} Delahunty planned to take the coroner's deposition, but after reaching stipulations with the medical defendants regarding the coroner's testing, he determined that he did not need to do so. Delahunty also spoke with Doctor Eric Gluck, a physician who is board certified in critical care and pulmonology. At no point did any of the physicians Delahunty spoke with suggest that the medical defendants had breached the standard of care by failing to maintain Gardenia's airway. In the meantime, the medical defendants presented expert reports that opined Gardenia had died due to an anaphylactic reaction to Demerol.

{¶ 29} The videotaped deposition of Doctor Hessler was then played for the jury. Doctor Hessler, who is board certified in otolaryngology and head and neck surgery, treated Gardenia for severe obstructive sleep apnea syndrome. He performed tubinate surgery with a tonsillectomy and palatoplasty to open the airway. Following surgery, Gardenia was doing well and was extubated. Minutes later, she was having more obstruction, so she was reintubated. Her pharyngeal tissues were swollen and puffy. He decided to perform a tracheostomy with a No. 6 tracheostomy tube to maintain her airway and facilitate recovery.

{¶ 30} The following day, Gardenia's trach tube had been cleaned and she had been given Demerol. At around 11:26 a.m., Doctor Hessler received a page to respond immediately to Gardenia's room in the ICU because she was experiencing difficulty breathing. Doctor Hessler observed that her face, lips, tongue, and eyelids were protuberant and swollen. There was no evidence of subcutaneous air in her system.

Doctor Hessler probed the tracheostomy site and because he could not feel the balloon cuff of the tube and because the trach was secure and sutured, he determined that the endotracheal tube was still in place. Doctor Weeman then attempted to insert a smaller endotracheal tube into the site, but he could not do so. He tried inserting a breathing tube, but could not. The team then tried jet ventilation through a small bore needle into the trachea, below the tracheostomy site. This pushed air into her system but all of their efforts were unsuccessful and Gardenia went into cardiac arrest and died.

{¶ 31} According to Doctor Hessler, Gardenia had an anaphylactic reaction that caused angioedema that prevented ventilation. He stated that the exact cause of the anaphylactic reaction would involve conjecture.

{¶ 32} The videotaped deposition of Doctor Weeman was played for the jury. Doctor Weeman responded to a code call to Gardenia's room, and the nurse explained that she had been performing tracheostomy care by suctioning mucous from the tube, but could not get the catheter past the tracheostomy site. Doctor Weeman determined that it was in place because the pressure on the cuff balloon of the apparatus was adequate. He tried to ventilate her with an Ambu bag and 100 percent oxygen but could not hear breath sounds. He rechecked the trach and reapplied the Ambu bag but could not hear breath sounds in her lungs. He next attempted to intubate her orally, but her tongue and lips were swollen and he could not insert the intubation blade due to edema in this area.

{¶ 33} He believed that Gardenia was experiencing an anaphylactic reaction so he administered Epinephrine. Doctors Hessler and Sibilia arrived, and Doctor Weeman next

attempted to pass a smaller endotracheal tube through the tracheostomy site but still could not establish ventilation. Doctor Sibilia examined the tracheostomy site with a fiber optic scope to determine its position but could not visualize any of the anatomical structures of the area. Doctor Sibilia then attempted jet ventilation. At this point, air exuded from the nose and mouth, indicating that the tracheostomy was in the proper position, but the doctors could not hear breath sounds in the lungs, and subcutaneous air went into her chest and leg. Gardenia went into cardiac arrest and the team administered cardiopulmonary resuscitation, but she died.

{¶ 34} According to Doctor Weeman, Gardenia had an anaphylactic reaction that caused generalized edema throughout her body and blocked ventilation.

{¶ 35} Doctor Bunge opined that Gardenia died as a result of an anaphylactic reaction to Demerol. According to Dr. Bunge, the reaction worsened with each dose, caused swelling, dilation of her blood vessels, and produced fluid in the lungs and loss of airway.

{¶ 36} Dr. Bunge further opined that the endotracheal tube was in its proper position because the cuff pressure was good and the tracheostomy was sutured into place. It was also noted to be in place in the autopsy. He testified that the medical defendants acted within their standard of care by trying any means necessary to save Gardenia, and they did not waste time in attempting to introduce the smaller tube into the tracheostomy site. He admitted, however, that the litigation theory of a Demerol overdose was not a viable theory in this matter.

{¶ 37} Finally, attorney Perantinides testified that Delahunty acted within his standard of care by having the case reviewed by physicians for possible medical malpractice, as an attorney is required to simply make an honest effort to secure an independent, scholarly expert. Perantinides admitted, however, that res ipsa loquitur was not a viable theory in the legal malpractice action.

{¶ 38} The jury subsequently rendered a general verdict in favor of defendants Delahunty and Elk & Elk, and in special interrogatories, concluded that Doctor Hessler, Doctor Weeman, and Wooster Hospital did not deviate from the standard of care in treating Gardenia and did not proximately cause her death.

{¶ 39} Plaintiff now appeals, assigning two errors for our review.

{¶ 40} Plaintiff's first assignment of error states:

{¶ 41} **"The trial court erred in instructing the jury."**

{¶ 42} Within this assignment of error, plaintiff argues that the trial court erred in giving a prejudicial "battle of the experts" instruction and in including the issue of foreseeability in a "hindsight" instruction.

{¶ 43} On appeal, this court must consider the jury charge as a whole in order to determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights. *Kokitka v. Ford Motor Co.,* 73 Ohio St.3d 89, 93, 1995-Ohio-84, 652 N.E.2d 671, quoting *Becker v. Lake Cty. Mem. Hosp.* (1990), 53 Ohio St.3d 202, 208, 560 N.E.2d 165. However, an inadequate jury instruction that

misleads the jury constitutes reversible error. *Groob v. KeyBank*, 108 Ohio St.3d 348, ¶32, 2006-Ohio-1189, 843 N.E.2d 1170.

Jury Instructions

1. So called "Battle of the Experts" Instruction

**{¶ 44}** Here, plaintiff maintains that the trial court's instructions identified this matter as a "battle of the experts," which prevented the jury from considering the medical records and any other admissible evidence that came in during the trial on the issue of the standard of care. Plaintiff notes that similar instructions were deemed prejudicially erroneous in *Withers v. Mercy Hosp. of Fairfield*, Butler App. No. CA2010-02-033, 2010-Ohio-6431. In *Withers*, the trial court gave the following instructions:

> **"* * * You must determine the standard of professional learning, skill and care required of [the doctor] only from the opinions of the various physicians and experts, including the defendant himself, who testified as expert witnesses in this case as to such a standard.**
>
> **You must not attempt to determine the standard of care or skill from any personal knowledge, experience or by any other means. * * *"**

**{¶ 45}** In this matter, however, the trial court instructed the jury as follows:

> **"In determining whether an issue has been proved by a preponderance of the evidence, you should consider all of the evidence, regardless of who produced it. * * * Evidence is all the testimony received from the witnesses including depositions, exhibits admitted into evidence during the trial, facts agreed to by counsel and any facts which the Court requires you to accept as true.**
>
> *** * ***
>
> **You are the judges of the facts, the credibility or believability of the witnesses and the weight of the evidence. * * ***

**You may believe or disbelieve all or any part of the testimony of any witness. It is your duty * * * to determine what testimony to believe and what testimony not to believe. * * ***

**In a case such as this, the issue of whether a physician has exercised ordinary care requires the plaintiffs who have the burden of proof to produce the testimony of the expert witness who can establish the recognized standard of care in the medical community under the circumstances and also establish that [the medical defendants] failed to exercise ordinary care.**

**An expert witness is one who, through study or experience or both * * * whose guidance is necessary for the jury to reach an informed judgment.**

**Such expert opinion also is required in order for you to determine whether any such claimed negligence deviated from the appropriate standard of care [and] was a proximate cause of the injury which is the subject of plaintiff's complaint.**

**Defendants are also entitled to present expert testimony that [the medical defendants] rendered reasonable[,] appropriate medical care and that their actions or inactions were not the proximate cause of injury.**

**Obviously, where there is a conflict* * * in the expert testimony on issues of negligence and proximate cause, you must decide which expert testimony is more credible or believable.**

**In order to find for plaintiffs, you must find that the opinions of plaintiff's experts are more likely to be true."**

{¶ 46} We find no prejudicial error. The trial court's instructions did not restrict the jury's consideration of all of the evidence and did not limit their consideration to an evaluation of competing expert testimony. To the contrary, the jury was properly instructed that the evidence included testimony received from the witnesses including depositions and exhibits admitted into evidence, and that they were to weigh all of the evidence. The jury was also instructed that "if there is a conflict * * * in the expert

testimony on issues of negligence and proximate cause, you must decide which expert testimony is more credible or believable." The court's instructions clearly and fairly expressed the law regarding the plaintiff's burden of proof. The instructions were not misleading to the jury and were not prejudicial to plaintiff.

{¶ 47} This portion of the instructions was not erroneous.

2.    Foreseeability

{¶ 48} Plaintiff next maintains that the trial court's "hindsight" instruction improperly included consideration of foreseeability. Plaintiff relies upon *Needham v. Gaylor* (Sept. 20, 1996), Montgomery App. No. 14834, in which the court held that the trial court erred in including the consideration of foreseeability of the injury in its charge because this could have misled the jury into thinking that the medical defendants were required to foresee the particular injury sustained in order to find them to be liable. The *Needham* Court also held that even a correct foreseeability instruction had no place in the trial court's instructions on the standard of care.

{¶ 49} In *Needham,* however, the court instructed the jury that:

{¶ 50} "In determining whether ordinary care was used, you will consider whether Dr. Gaylor ought to have foreseen under the circumstances that the natural and probable result of his act would cause harm."

{¶ 51} The court held that the test for foreseeability is not whether the defendant should have foreseen the result exactly as it happened, the test is whether under all the

circumstances a reasonably prudent physician in his specialty would have anticipated the result to the patient.

{¶ 52} In this matter, however, the trial court instructed the jury as follows:

**"In determining whether a physician was negligent, you should consider their judgment in light of all the attendant circumstances on the date and at the time of the alleged negligent event.   The test of the existence of medical negligence is not hindsight, but one of foresight, considering all of the then known facts and with the state of medical knowledge at the time the physician acted."**

{¶ 53} In *Holda v. Blankfield*, Cuyahoga App. No. 84350, 2005-Ohio-766, this court observed that such instruction is a correct statement of the law.   Accord *Clements v. Lima Mem. Hosp.*, Allen App. No. 1-09-24, 2010-Ohio-602, citing *Grabill v. Worthington Industries, Inc.* (1994), 98 Ohio App.3d 739, 744, 649 N.E.2d 874.   This claim is therefore without merit.

{¶ 54} The first assignment of error is without merit.

{¶ 55} Plaintiff's second assignment of error states:

**"The jury's verdict in this matter was against the manifest weight of the evidence."**

{¶ 56} The standard for determining whether a civil judgment is supported by the manifest weight of the evidence provides that judgments "supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."   *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578.   The reviewing court must indulge every reasonable presumption in favor of the trial court's judgment and

findings of fact, and if the evidence is susceptible to more than one interpretation, we must construe it consistently with the lower court's judgment. *Gerijo v. Fairfield*, 70 Ohio St.3d 223, 226, 1994-Ohio-432, 638 N.E.2d 533.

{¶ 57} In order to establish a cause of action for legal malpractice based on negligent representation, a plaintiff must show (1) that the attorney owed a duty or obligation to the plaintiff, (2) that there was a breach of that duty or obligation and that the attorney failed to conform to the standard required by law, and (3) that there is a causal connection between the conduct complained of and the resulting damage or loss. *Vahila v. Hall*, 77 Ohio St.3d 421, 1997-Ohio-259, 674 N.E.2d 1164, at syllabus, following *Krahn v. Kinney* (1989), 43 Ohio St.3d 103, 538 N.E.2d 1058.

{¶ 58} The *Vahila* court recognized that depending on the situation, a plaintiff may be required to provide some evidence of the merits of the underlying claim, but it declined to "endorse a blanket proposition that requires a plaintiff to prove, in every instance, that he or she would have been successful in the underlying matter." Id. at 428. Thus, plaintiffs are not required to prove their "case within a case."[3] Rather, the correct focus is whether the alleged negligence caused "damage or loss regardless of the fact that [the

---

[3]An action for medical malpractice requires the plaintiff to show that the physicians who treated the patient failed to meet their duty to employ that degree of skill, care, and diligence that a physician or surgeon of the same medical specialty would employ in like circumstances, which proximately caused the patient's death. See *Berdyck v. Shinde,* 66 Ohio St.3d 573, 579, 1993-Ohio-183, 613 N.E.2d 1014, citing *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 346 N.E.2d 673.

plaintiffs] may be unable to prove that they would have been successful in the underlying matter(s) in question." Id. at 427.

**{¶ 59}** In this matter, plaintiff asserts that the judgment is not supported by competent, credible evidence because the opinion testimony of defense expert, Doctor Bunge, was premised upon his erroneous view that "ventilator alarms were not going off at the time the deceased received her last dose of Demerol," and all of the experts agreed that it is a breach of the standard of care for a medical provider to fail to realize that a patient is not being adequately ventilated. Plaintiff also asserts that the jury's responses to the special interrogatories demonstrate that it lost its way in evaluating the evidence because the jury concluded that the defendants did not deviate from the standard of care, yet went on to consider the issue of causation.

**{¶ 60}** With regard to the evidence presented in this matter on the issue of legal malpractice, there was competent, credible evidence to establish that physicians retained as independent contractors by Elk & Elk informed Delahunty that they did not believe that there was any viable cause of action, but he wanted to give the family a chance. Relying upon the coroner's report, which indicated that Gardenia had a Demerol level of five times the limit, and toxicologist Olen Brown, Ph.D., Delahunty eventually determined that there was a good faith basis to conclude that Gardenia had died from a Demerol overdose. The firm made several scrivener's errors on the pleadings and requests for records, and improperly included a claim for punitive damages against a municipal hospital.

{¶ 61} Delahunty did not depose the defense medical experts, but he did not want to do so until he had retained an expert. Delahunty dismissed the complaint after learning that Doctor Brown could not testify for plaintiff, in order to avoid a court ordered dismissal for failure to identify an expert. After refiling the matter, Delahunty sought out numerous experts on the issue of the standard of care in this matter, through AMFS and independently of this service. He subsequently retained Doctor Gustin, who did not meet the requirements for testifying as to liability, but believed, with regard to the issue of proximate cause, that Gardenia suffered a fatal drug overdose. At that point, the firm had expended over $13,000, a sum which was not charged back to the Turner family. Moreover, at no point did any of the physicians Delahunty spoke with suggest that the medical defendants had breached the standard of care by failing to maintain Gardenia's airway. Based upon this evidence, the jury could reasonably determine that Delahunty satisfied his duty of care. Although the Demerol overdose theory was later considered to be without merit, Delahunty was nonetheless within his duty of care as he undertook an extensive, multifaceted approach to obtaining evidence in support of the medical malpractice action.

{¶ 62} Delahunty then determined that based upon the overdose theory, plaintiff could rely upon the doctrine of res ipsa loquitur to establish liability. The trial court held, however, that res ipsa loquitur could not be applied to the matter and, after attempting to effect a settlement, dismissed the matter. Inasmuch as the Ohio Supreme Court did not fully define the limitations of res ipsa loquitur in a medical malpractice case until 2010 in

*Estate of Hall v. Akron Gen. Med. Ctr.*, 125 Ohio St.3d 300, 2010-Ohio-1041, 927 N.E.2d 1112, and inasmuch as Delahunty could not locate an expert despite a lengthy and costly search, we conclude that he was within his duty of care in advancing this theory.

{¶ 63} The firm commenced an appeal, and during Delahunty's medical leave, the appeal was dismissed after Traska failed to timely file the appellant's brief, due to a paralegal's docketing error. Pursuant to *Estate of Hall*, the instruction is not warranted in medical malpractice action where medical experts present opposing opinions regarding cause of an injury, and one which was not attributable to negligence, and the injury is a known risk and complication of the procedure even when performed in compliance with standard of care. Thus, the jury could have determined that the outcome of the case would not have changed, even if the appellant's brief had been timely filed, so legal malpractice was not established in the appellate proceedings.

{¶ 64} Moreover, there was extensive competent, credible evidence to establish that Gardenia did not die due to improper placement of the tracheostomy tube and/or the medical defendants' failure to recognize and correct that improper placement. Rather, according to Doctor Hessler and Doctor Weeman, the trach remained in its proper position; and, according to the coroner, Doctor Hessler, Doctor Weeman, and Dr. Bunge, Gardenia died due to acute respiratory insufficiency with massive generalized edema from an acute anaphylactic reaction, after the medical defendants undertook a variety of measures to save her.

**{¶ 65}** Although Doctor Kress opined that Gardenia died as a result of a lost airway and not an anaphylactic reaction, the autopsy states that "an Endotracheal tube is in place through a tracheostomy," and the doctors who cared for her confirmed that it was in proper position. Further, regardless of the dispute as to whether the ventilator alarms were sounding prior to the final Demerol injection, Gardenia experienced massive edema. Further, Doctor Kress admitted that if during ventilation attempts air had come out of Gardenia's nose, this could indicate that the trachea was in its proper position and that Demerol can cause an anaphylactic reaction.

**{¶ 66}** Finally, with regard to the fact that the jury concluded in the special interrogatories that the medical defendants were not negligent, then proceeded to consider the issue of causation, we note that the interrogatories are neither inconsistent with one another nor inconsistent with the general defense verdict. Rather, they advance the essential purpose of testing the correctness of the general verdict. *Cincinnati Riverfront Coliseum, Inc. v. McNulty Co.* (1986), 28 Ohio St.3d 333, 504 N.E.2d 415. The interrogatory responses do not undermine the manifest weight of the evidence supporting the defense verdict.

**{¶ 67}** The second assignment of error is without merit.

Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

_____
MARY EILEEN KILBANE, ADMINISTRATIVE JUDGE

PATRICIA A. BLACKMON, J., and
FRANK D. CELEBREZZE, JR., J., CONCUR